# DROPE *v.* MISSOURI

No. 73–6038.  Argued November 13, 1974—
Decided February 19, 1975

*Thomas C. Walsh* argued the cause for petitioner. With him on the briefs was *Charles A. Weiss.*

*Neil MacFarlane,* Assistant Attorney General of Missouri, argued the cause for respondent. With him on the brief were *John C. Danforth,* Attorney General, and *David Robards,* Assistant Attorney General.

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari in this case to consider petitioner's claims that he was deprived of due process of law by the failure of the trial court to order a psychiatric

examination with respect to his competence to stand trial and by the conduct in his absence of a portion of his trial on an indictment charging a capital offense.

I

In February 1969 an indictment was returned in the Circuit Court of St. Louis, Mo., charging petitioner and two others with the forcible rape of petitioner's wife. Following severance of petitioner's case from those of the other defendants and a continuance, on May 27 his counsel filed a motion for a continuance until September, in order that petitioner might be examined and receive psychiatric treatment. Treatment had been suggested by a psychiatrist who had examined petitioner at his counsel's request and whose report was attached to the motion.[1] On the same date respondent, through the

---

[1] The motion recites: "Comes now the Defendant, JAMES E. DROPE, and states to the court that he has had a psychiatric examination made by Dr. Joseph F. Shuman, M. D., a copy of which report is attached hereto.

"Defendant moves the court to continue his case until September, 1969 in order that he might receive an Examination, Evaluation and psychiatric treatment, as suggested by Dr. Shuman, at the Malcomb Bliss Hospital in the City of St. Louis, Missouri." App. 7.

The report, in the form of a letter to petitioner's attorney, states that the psychiatrist examined petitioner on February 20, 1969. In a section entitled "Past Medical History" it describes petitioner as "markedly agitated and upset," noting that he "appeared to be cooperative in this examination, but he had difficulty in participating well." The report continues: "The patient had a difficult time relating. He was markedly circumstantial and irrelevant in his speech. . . . There was no sign as to the presence of any delusions, illusions, hallucinations, obsessions, ideas of reference, compulsions or phobias at this time.

"In a simple IQ exam Mr. Drope was able to achieve a score in the low normal range . . . . Mr. Drope was well oriented in all spheres. With much difficulty he was able to

Assistant Circuit Attorney, filed a document stating that the State did not oppose the motion for a psychiatric examination. Apparently no action was taken on the motion, and petitioner's case was continued until June 23, at which time his counsel objected to proceeding with the trial on the ground that he had understood the case would be continued until September and consequently was not prepared. He objected further "for the reason that the defendant is not a person of sound mind and should have a further psychiatric examination before the case should be forced to trial." App. 19. The trial judge noted that the motion for a continuance was not in proper form and that, although petitioner's counsel had agreed to file another, he had failed to do so, and he overruled his objections and directed that the case proceed to trial.

On June 24 a jury was empaneled, and the prosecution called petitioner's wife as its first witness. She testified that petitioner participated with four of his acquaintances in forcibly raping her and subjecting her to other bizarre abuse and indignities, but that she had resumed living

explain a few abstractions. . . . He was able, without trouble, to answer questions testing judgement. He had much difficulty even doing the simple counting and calculation problems." The report then recounts the details of a conversation between the psychiatrist and petitioner's wife. The latter admitted that she had left petitioner on a number of occasions because of his sexual perversions and described the "strange behavior" of petitioner, including falling down flights of stairs, as an attempt to gain sympathy from her. In a section entitled "Impression," the report states that petitioner had "always led a marginal existence," that he had a "history of anti-social conduct," but that there were no "strong signs of psychosis at this time." It concludes that petitioner "certainly needs the aid of a psychiatrist," and that he "is a very neurotic individual who is also depressed and perhaps he is depressed for most of the time," and it offers as diagnoses: "(1) Sociopathic personality disorder, sexual perversion. (2) Borderline mental deficiency. (3) Chronic Anxiety reaction with depression." *Id.*, at 11–12.

with him after the incident on the advice of petitioner's psychiatrist and so that their children would be taken care of. On cross-examination, she testified that she had told petitioner's attorney of her belief that her husband was sick and needed psychiatric care and that for these reasons she had signed a statement disavowing a desire to prosecute. She related that on several occasions when petitioner did not "get his way or [was] worried about something," he would roll down the stairs. She could explain such behavior only by relating "what they told him many times at City Hospital, that is something he does upon hisself [sic]." *Id.,* at 47. However, she also stated that she was not convinced petitioner was sick after talking to his psychiatrist, and that she had changed her mind about not wanting to prosecute petitioner because, as she testified, he had "tried to choke me, tried to kill me" on the Sunday evening prior to trial. *Id.,* at 52.

The prosecution called three more witnesses, but did not conclude its case, before adjournment on June 24. The following morning, petitioner did not appear. When the trial judge directed counsel to proceed, petitioner's attorney moved for a mistrial "in view of the fact that the defendant, I am informed, shot himself this morning." App. 63. The trial judge denied the motion, stating that he had already decided the matter would proceed for trial, and when petitioner's counsel complained of the difficulty of proceeding without a client, the trial judge replied that the difficulty was brought about by petitioner, who was on bond and had a responsibility to be present. The prosecution then called four more witnesses and, after producing proof of a prior conviction,[2] rested its case. Petitioner's "Motion for Verdict of Acquittal," including

---

[2] Petitioner was tried as a second offender under Mo. Rev. Stat. § 556.280 (1969), having been convicted in 1958 of second-degree burglary and "stealing."

in effect a renewal of the motion for a mistrial, was denied, and his counsel stated that he had "no evidence to produce at this time under the circumstances." *Id.,* at 64. The jury returned a verdict of guilty, and on July 21, 1969, petitioner, who had been in the hospital for three weeks recovering from a bullet wound in the abdomen, appeared, and the trial court fixed the penalty at life imprisonment.

Petitioner filed a motion for a new trial, the burden of which was that the trial court had erred in proceeding with the trial when no evidence had been produced that his absence from the trial was voluntary. A hearing was held before the judge who had presided at trial. Petitioner testified that on June 25 he had gone to his brother's house and that he remembered nothing concerning the shooting except that he felt a burning pain in his stomach and later woke up in the hospital. He testified he did not remember talking to anyone at the hospital. The State presented evidence that upon admission to the hospital petitioner stated that he had shot himself because of " 'some problem with the law,' " *id.,* at 90, and that he had told a policeman he had shot himself because "he was supposed to go to court for rape, and he didn't do it; he rather be [*sic*] dead than to go to trial for something he didn't do." *Id.,* at 97. The trial judge denied the motion. Stating that on the morning of petitioner's failure to appear he had received information on the telephone which was checked with the hospital, the judge concluded that petitioner had the burden of showing that his absence was not voluntary and found on the basis of the evidence that his absence " 'was due to his own voluntary act in shooting himself; done for the very purpose of avoiding trial.' " *Id.,* at 103.

The Missouri Supreme Court affirmed, accepting the trial court's finding, in ruling on petitioner's motion for a

new trial, that his absence was voluntary,[3] and holding that there was "no logical basis" for positing a different rule with respect to waiver of the right to be present in capital cases[4] than that which applies in felony cases generally. 462 S. W. 2d 677, 683–684. The Missouri Supreme Court also held that the denial of petitioner's motion for a continuance of the trial in order to procure further psychiatric evaluation was not an abuse of discretion, noting that petitioner did not contend that he lacked the mental capacity to proceed with the trial.

In April 1971 petitioner filed a motion to vacate the judgment of conviction and sentence in the court where sentence had been imposed, pursuant to Missouri Supreme Court Rule 27.26.[5] He alleged that his rights under Mo. Rev. Stat. § 552.020 (2) (1969)[6] and his

---

[3] As to the situation at trial, the Missouri Supreme Court stated: "We disagree with defendant's contention that there is 'no evidence upon the record' that he voluntarily absented himself. The court made such a determination before proceeding with the trial, although the basis for that determination is not fully disclosed. However, when defendant is free on bond, and he does not appear at the appointed time, it is presumed that the absence is voluntary until established otherwise." 462 S. W. 2d 677, 681 (1971).

[4] At the time of petitioner's trial, rape was punishable by death under Mo. Rev. Stat. § 559.260 (1969), and respondent had not waived the death penalty.

[5] A petition for a writ of habeas corpus previously filed in the United States District Court for the Eastern District of Missouri had been dismissed without prejudice on April 1, 1971, for failure to exhaust available state remedies. See 28 U. S. C. §§ 2254 (b), (c).

[6] Subdivision 2 of § 552.020 provides in pertinent part: "Whenever any judge or magistrate has reasonable cause to believe that the accused has a mental disease or defect excluding fitness to proceed he shall, upon his own motion or upon motion filed by the state or by or on behalf of the accused, by order of record, appoint one or more private physicians to make a psychiatric examination of the accused or shall direct the superintendent of a facility of the division of mental diseases to have the accused so examined by one or more physi-

constitutional rights had been violated by the failure to order a psychiatric examination prior to trial and by conducting the trial to conclusion in his absence. Petitioner also asserted that he had been denied the effective assistance of counsel, a claim which is not before us.

In July 1971 a hearing was held on the motion; petitioner called two psychiatrists as witnesses. The psychiatrist who had examined petitioner prior to his trial testified that in his opinion there was reasonable cause to believe that a person who attempted to commit suicide in the midst of a trial might not be mentally competent to understand the proceedings against him. Another psychiatrist, whose duties included the examination of accused persons under Mo. Rev. Stat. c. 552, testified that in his opinion a man who was charged with raping his wife and attempted suicide during his trial was in need of a psychiatric evaluation to find out his mental condition, and that there should be an evaluation to determine whether the person was competent to assist in his own defense and whether he was "malingering or did it intentionally or if it was due to a true psychiatric disorder." App. 156. The same psychiatrist stated that he had examined petitioner at City Hospital in 1965 and had found that he had psychiatric problems and was in need of care. Petitioner took the stand, repeating his previous testimony with respect to the shooting.

In June 1972 the sentencing judge denied petitioner's Rule 27.26 motion, and the Missouri Court of Appeals affirmed. The Court of Appeals concluded that the provisions for psychiatric examinations and hearings under Mo. Rev. Stat. § 552.020 (1969) comported with the re-

cians whom the superintendent shall designate." Subdivision 3 delineates the requirements for reports of psychiatric examinations, and subdivision 6 requires the court to hold a hearing if the opinion relative to fitness to proceed which is required to be included in the report is contested.

quirements of *Pate* v. *Robinson,* 383 U. S. 375 (1966), and that the test of incompetence to stand trial was that stated in *Dusky* v. *United States,* 362 U. S. 402 (1960).[7] It reasoned that it was necessary to examine the indicia of petitioner's incompetence "at three different times— before the trial, during the trial after the suicide attempt, and at the time of the motion for new trial." 498 S. W. 2d 838, 842.

As to the situation before trial, the court held that the psychiatric report attached to petitioner's motion for a continuance did not raise a reasonable doubt of his fitness to proceed. Turning to the second time period, "during the trial after the suicide attempt," the court held that *Pate* v. *Robinson, supra,* which involved a competence hearing rather than a competence examination followed by a hearing, did not require that the examination and hearing be held during the trial rather than immediately thereafter. With regard to the period after trial, and accepting petitioner's contention that his was a "bona fide attempt at suicide," the court was of the view that the legal significance of the attempt under *Robinson* should be evaluated without resort to the psychiatric testimony presented at the Rule 27.26 hearing, which was not before the trial judge. It held that petitioner's suicide attempt did not create a reasonable doubt of his competence as a matter of law, that petitioner had failed to demonstrate the inadequacy of the procedures employed for protecting his rights, and that the finding of the trial court was not clearly erroneous.[8]

---

[7] "[T]he 'test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.' " See also Mo. Rev. Stat. § 552.020 (1) (1969).

[8] Under Missouri Supreme Court Rule 27.26 (f) (1969), the "prisoner has the burden of establishing his grounds for relief by a

Finally, the Missouri Court of Appeals rejected petitioner's claim that he was deprived of due process of law by the conduct of a portion of his trial in his absence; it noted that the State Supreme Court had upheld a finding of voluntary absence on petitioner's direct appeal and concluded that the psychiatrists' testimony at the Rule 27.26 hearing did not meet the burden of proof placed on petitioner. "Again we cannot hold the trial court's finding to be clearly erroneous." 498 S. W. 2d, at 843. We granted certiorari, and we now reverse.

## II

It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial. Thus, Blackstone wrote that one who became "mad" after the commission of an offense should not be arraigned for it "because he is not able to plead to it with that advice and caution that he ought." Similarly, if he became "mad" after pleading, he should not be tried, "for how can he make his defense?" 4 W. Blackstone, Commentaries *24. See *Youtsey* v. *United States,* 97 F. 937, 940–946 (CA6 1899). Some have viewed the common-law prohibition "as a by-product of the ban against trials *in absentia;* the mentally incompetent defendant, though physically present in the courtroom, is in reality afforded no opportunity to defend himself." Foote, A Comment on Pre-Trial Commitment of Criminal Defendants, 108 U. Pa. L. Rev. 832, 834 (1960). See *Thomas* v. *Cunningham,* 313 F. 2d 934, 938 (CA4 1963). For our purposes, it suffices

---

preponderance of the evidence." Appellate review is limited under Rule 27.26 (j) "to a determination of whether the findings, conclusions and judgment of the trial court are clearly erroneous."

to note that the prohibition is fundamental to an adversary system of justice. See generally Note, Incompetency to Stand Trial, 81 Harv. L. Rev. 455, 457–459 (1967). Accordingly, as to federal cases, we have approved a test of incompetence which seeks to ascertain whether a criminal defendant " 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.' " *Dusky* v. *United States,* 362 U. S., at 402.

In *Pate* v. *Robinson,* 383 U. S. 375 (1966), we held that the failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial. Although in *Robinson* we noted that Illinois "jealously guard[ed] this right," *id.,* at 385, we held that the failure of the state courts to invoke the statutory procedures deprived Robinson of the inquiry into the issue of his competence to stand trial to which, on the facts of the case, we concluded he was constitutionally entitled. The Court did not hold that the procedure prescribed by Ill. Rev. Stat., c. 38, § 104–2 (1963), was constitutionally mandated, although central to its discussion was the conclusion that the statutory procedure, if followed, was constitutionally adequate. See, *e. g., United States* v. *Knohl,* 379 F. 2d 427, 434–435 (CA2), cert. denied, 389 U. S. 973 (1967); *United States ex rel. Evans* v. *LaVallee,* 446 F. 2d 782, 785–786 (CA2 1971), cert. denied, 404 U. S. 1020 (1972). Nor did the Court prescribe a general standard with respect to the nature or quantum of evidence necessary to require resort to an adequate procedure.[9] Rather, it noted that

[9] In discussing the evidence adduced at Robinson's trial, the Court did, however, indicate that a history of irrational behavior is a rele-

under the Illinois statute a hearing was required where the evidence raised a " 'bona fide doubt' " as to a defendant's competence, and the Court concluded "that the evidence introduced on Robinson's behalf entitled him to a hearing on this issue." 383 U. S., at 385. See *United States* v. *Marshall*, 458 F. 2d 446, 450 (CA2 1972).

As was true of Illinois in *Robinson*, Missouri's statutory scheme "jealously guards" a defendant's right to a fair trial. Missouri Rev. Stat. § 552.020 (1) (1969) provides: "No person who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted or sentenced for the commission of an offense so long as the incapacity endures." Section 552.020 (2), see n. 6, provides that a judge or magistrate shall, "upon his own motion or upon motion filed by the state or by or on behalf of the accused," order a psychiatric examination whenever he "has reasonable cause to believe that the accused has a mental disease or defect excluding fitness to proceed." Section 552.020 (3) prescribes the contents of a report of the psychiatric examination, and § 552.030 (6) requires the court to hold a hearing if the opinion relative to fitness to proceed which is required to be included in the report is contested. In addition, the trial court may conduct a hearing on its own motion. Such a procedure is, on its face, constitutionally adequate to protect a defendant's right not to be tried while legally incompetent. Our task is to determine whether the proceedings in this case were consistent with petitioner's right to a fair trial.

---

vant factor which, on the record before it, was sufficient to require further inquiry notwithstanding Robinson's demeanor at trial and the stipulated opinion of a psychiatrist that Robinson knew the nature of the charges against him and could cooperate with counsel when the psychiatrist examined him two or three months before. See *infra*, at 180–181.

At the outset we are met by respondent's argument that the Court is bound by "limitations placed on proceedings under" Missouri Supreme Court Rule 27.26. Brief for Respondent 23. Specifically, respondent notes that under Rule 27.26 (f) petitioner had "the burden of establishing his grounds for relief by a preponderance of the evidence," and that the appellate-review function of the Missouri Court of Appeals was limited by Rule 27.26 (j) "to a determination of whether the findings, conclusions and judgment of the trial court [were] clearly erroneous." It urges that the Rule was "designed . . . to provide a valuable post-conviction remedy and not to provide another direct appeal . . . ," and expresses concern that "the state-federal relationship . . . remain in proper balance." Brief for Respondent 22.

We share respondent's concern for this necessary balance, and we do not question the State's power, in post-conviction proceedings, to reallocate the respective burdens of the individual and the State and to delimit the scope of state appellate review. Cf. *Hawk* v. *Olson,* 326 U. S. 271, 279 (1945); *Conner* v. *Wingo,* 429 F. 2d 630, 637–639 (CA6 1970). At the same time we note that while proceedings under the Rule "ordinarily cannot be used as a substitute for direct appeal involving mere trial errors or as a substitute for a second appeal," nevertheless "trial errors affecting constitutional rights may be raised even though the error could have been raised on appeal." Mo. Sup. Ct. Rule 27.26 (b) (3).

In the present case there is no dispute as to the evidence possibly relevant to petitioner's mental condition that was before the trial court prior to trial and thereafter. Rather, the dispute concerns the inferences that were to be drawn from the undisputed evidence and whether, in light of what was then known, the failure to make further inquiry into petitioner's competence to

stand trial, denied him a fair trial. In such circumstances we believe it is "incumbent upon us to analyze the facts in order that the appropriate enforcement of the federal right may be assured." *Norris* v. *Alabama,* 294 U. S. 587, 590 (1935).[10] "When the corrective process is provided by the state but error, in relation to the federal question of constitutional violation, creeps into the record, we have the responsibility to review the state proceedings." *Hawk* v. *Olson, supra,* at 276.

## III

The sentencing judge and the Missouri Court of Appeals concluded that the psychiatric evaluation of petitioner attached to his pretrial motion for a continuance did not contain sufficient indicia of incompetence to stand trial to require further inquiry. Both courts mentioned aspects of the report suggesting competence, such as the impressions that petitioner did not have "any delusions, illusions, hallucinations . . . ," was "well oriented in all spheres," and "was able, without trouble, to answer questions testing judgement," but neither court mentioned the contrary data. The report also showed that petitioner, although cooperative in the examination, "had difficulty in participating well," "had a difficult

---

[10] "But 'issue of fact' is a coat of many colors. It does not cover a conclusion drawn from uncontroverted happenings, when that conclusion incorporates standards of conduct or criteria for judgment which in themselves are decisive of constitutional rights. Such standards and criteria, measured against the requirements drawn from constitutional provisions, and their proper applications, are issues for this Court's adjudication. . . . Especially in cases arising under the Due Process Clause is it important to distinguish between issues of fact that are here foreclosed and issues which, though cast in the form of determinations of fact, are the very issues to review which this Court sits." *Watts* v. *Indiana,* 338 U. S. 49, 51 (1949) (opinion of Frankfurter, J.). See also *Culombe* v. *Connecticut,* 367 U. S. 568, 605 (1961) (opinion of Frankfurter, J.).

time relating," and that he "was markedly circumstantial and irrelevant in his speech." In addition, neither court felt that petitioner's episodic irrational acts described in the report or the psychiatrist's diagnoses of "[b]orderline mental deficiency" and "[c]hronic [a]nxiety reaction with depression" created a sufficient doubt of competence to require further inquiry.[11]

It does not appear that the examining psychiatrist was asked to address himself to medical facts bearing specifically on the issue of petitioner's competence to stand trial, as distinguished from his mental and emotional condition generally. Thus, it is not surprising that before this Court the dispute centers on the inferences that could or should properly have been drawn from the report. Even where the issue is in focus we have recognized "the uncertainty of diagnosis in this field and the tentativeness of professional judgment." *Greenwood* v. *United States,* 350 U. S. 366, 375 (1956). Here the inquiry is rendered more difficult by the fact that a defendant's mental condition may be relevant to more than one legal issue, each governed by distinct rules reflecting quite different policies. See *Jackson* v. *Indiana,* 406 U. S. 715, 739 (1972); *Pate* v. *Robinson,* 383 U. S., at 388–389 (Harlan, J., dissenting); Weihofen, The Definition of Mental Illness, 21 Ohio St. L. J. 1 (1960).

Like the report itself, the motion for a continuance did not clearly suggest that petitioner's competence to stand trial was the question sought to be resolved. While we have expressed doubt that the right to further inquiry upon the question can be waived, see *Pate* v. *Robinson,* 383 U. S., at 384, it is nevertheless true that judges must

---

[11] See n. 1, *supra.* The Court of Appeals determined that the other diagnosis offered, "[s]ociopathic personality disorder, sexual perversion," was excluded as a "mental disease or defect" under Missouri law. See Mo. Rev. Stat. § 552.010 (1969).

depend to some extent on counsel to bring issues into focus. Petitioner's somewhat inartfully drawn motion for a continuance probably fell short of appropriate assistance to the trial court in that regard. However, we are constrained to disagree with the sentencing judge that counsel's pretrial contention that "the defendant is not a person of sound mind and should have a further psychiatric examination before the case should be forced to trial," did not raise the issue of petitioner's competence to stand trial.[12] This statement also may have tended to blur the aspect of petitioner's mental condition which would bear on his criminal responsibility and that which would bear on his competence to stand trial. However, at that stage, and with the obvious advantages of hindsight, it seems to us that it would have been, at the very least, the better practice to order an immediate examination under Mo. Rev. Code § 552.020 (2) (1969).[13]  It

---

[12] In a colloquy with the trial judge, petitioner's counsel noted that the examination and evaluation "could be done during the summer months and be ready for trial *or else the examination would eliminate trial by September.*" App. 17. (Emphasis added.)

[13] The sentencing judge observed that "motions for psychiatric examinations have often been made merely for the purpose of delay," and "estimated that almost seventy-five percent of those sent for psychiatric examinations are returned mentally competent." App. 202. Although we do not, of course, suggest that courts must accept without question a lawyer's representations concerning the competence of his client, see *United States ex rel. Rizzi* v. *Follette,* 367 F. 2d 559, 561 (CA2 1966), an expressed doubt in that regard by one with "the closest contact with the defendant," *Pate* v. *Robinson,* 383 U. S. 375, 391 (1966) (Harlan, J., dissenting), is unquestionably a factor which should be considered. Moreover, resolution of the issue of competence to stand trial at an early date best serves both the interests of fairness, see *Peyton* v. *Rowe,* 391 U. S. 54, 62 (1968), and of sound judicial administration. See Panel on Recognizing and Determining Mental Competency to Stand Trial—Insanity as a Defense, in Institutes on Sentencing, 37 F. R. D. 111, 155, 161 (1964). Realization of those facts may have prompted the practice, noted by the sentencing

is unnecessary for us to decide whether such examination was constitutionally required on the basis of what was then known to the trial court since in our view the question was settled by later events.

## IV

Turning to the situation at petitioner's trial, the state courts viewed the evidence as failing to show that during trial petitioner had acted in a manner that would cause the trial court to doubt his competence. The testimony of petitioner's wife, some of which repeated and confirmed information contained in the psychiatric evaluation attached to petitioner's motion for a continuance, was given little weight.[14] Finally, the sentencing judge, relying on his finding on petitioner's motion for a new trial and although stating "that it does not take a psychiatrist to know that such a man has a problem and indicates poor judgment," App. 203, concluded that the "fact that Mr. Drope shot himself to avoid trial suggests very

court, "of the Circuit Attorney at the time to consent in all cases to a psychiatric examination whether with or without merit and without looking into the matter further." App. 206.

[14] See n. 1, *supra*. The sentencing court noted: "She did testify in answer to the question 'And at that time didn't you tell me that you felt your husband was sick and needed psychiatric care?' The answer 'Yes.' There was also some evidence of disputes and trouble accompanied by some physical force between husband and wife but not to the extent to indicate inability to understand the proceedings. There was no recitation of facts upon which a layman could base the opinion that the defendant was insane except the testimony perhaps that he rolled down the steps but this occurred only two or three times over a period of eight or nine or ten years." App. 201. The Court of Appeals dealt with her testimony only insofar as it repeated information in the psychiatric evaluation. It concluded that her feelings that petitioner had mental problems "bore on his sexual perversions—not his competency," and that the stairs episodes "demonstrate[d] pique more than anything." 498 S. W. 2d, at 842.

strongly an awareness of what was going on." *Id.*, at 208. The Missouri Court of Appeals, accepting *arguendo* petitioner's contention that his was "a bona fide attempt at suicide," refused to conclude "that as a matter of law an attempt at suicide creates a reasonable doubt as to the movant's competency to stand trial." *Id.*, at 222.

Notwithstanding the difficulty of making evaluations of the kind required in these circumstances, we conclude that the record reveals a failure to give proper weight to the information suggesting incompetence which came to light during trial. This is particularly so when viewed in the context of the events surrounding petitioner's suicide attempt and against the background of the pretrial showing. Although a defendant's demeanor during trial may be such as to obviate "the need for extensive reliance on psychiatric prediction concerning his capabilities," Note, 81 Harv. L. Rev., at 469, we concluded in *Pate* v. *Robinson,* 383 U. S., at 385–386, that "this reasoning offers no justification for ignoring the uncontradicted testimony of . . . [a] history of pronounced irrational behavior." We do not mean to suggest that the indicia of such behavior in this case approximated those in *Robinson,* but we believe the Missouri courts failed to consider and give proper weight to the record evidence. Too little weight was given to the testimony of petitioner's wife that on the Sunday prior to trial he tried to choke her to death. For a man whose fate depended in large measure on the indulgence of his wife, who had hesitated about pressing the prosecution, this hardly could be regarded as rational conduct.[15] Moreover, in considering the indicia of petitioner's

---

[15] It appears that under Mo. Rev. Stat. § 546.260 (1969) petitioner's wife could not be compelled to testify against him. See *State* v. *Dunbar,* 360 Mo. 788, 230 S. W. 2d 845 (1950). Similarly, neither court mentioned Mrs. Drope's testimony concerning petitioner's consultations at City Hospital. At the Rule 27.26 hearing, it will be recalled, a psychiatrist testified that he had examined peti-

incompetence separately, the state courts gave insufficient attention to the aggregate of those indicia in applying the objective standard of Mo. Rev. Stat. § 552.020 (2). We need not address the Court of Appeals' conclusion that an attempt to commit suicide does not create a reasonable doubt of competence to stand trial as a matter of law. As was true of the psychiatric evaluation, petitioner's attempt to commit suicide "did not stand alone." *Moore* v. *United States,* 464 F. 2d 663, 666 (CA9 1972). We conclude that when considered together with the information available prior to trial and the testimony of petitioner's wife at trial, the information concerning petitioner's suicide attempt created a sufficient doubt of his competence to stand trial to require further inquiry on the question.

The import of our decision in *Pate* v. *Robinson* is that evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts.

Here, the evidence of irrational behavior prior to trial was weaker than in *Robinson,* but there was no opinion evidence as to petitioner's competence to stand trial. See n. 9, *supra.* Moreover, Robinson was present throughout his trial; petitioner was absent for a crucial portion of his

tioner at City Hospital in 1965 and had determined that he was in need of psychiatric care.

trial. Petitioner's absence bears on the analysis in two ways: first, it was due to an act which suggests a rather substantial degree of mental instability contemporaneous with the trial, see *Pate* v. *Robinson,* 383 U. S., at 389 (Harlan, J., dissenting) ; [16] second, as a result of petitioner's absence the trial judge and defense counsel were no longer able to observe him in the context of the trial and to gauge from his demeanor whether he was able to cooperate with his attorney and to understand the nature and object of the proceedings against him.

Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial. Whatever the relationship between mental illness and incompetence to stand trial, in this case the bearing of the former on the latter was sufficiently likely that, in light of the evidence of petitioner's behavior including his suicide attempt, and there being no opportunity without his presence to evaluate that bearing in fact, the correct course was to suspend the trial until such an evaluation could be made.[17] That this might have

---

[16] We assume, as did the Missouri Court of Appeals, that petitioner's was a "bona fide" suicide attempt, rather than, as respondent contends, malingering. In that regard, the hearsay information in the possession of the trial judge when he denied the motion for a mistrial suggested an intent on the part of petitioner to kill himself, and a self-inflicted wound near vital organs does not suggest malingering. Of course we also recognize that "the empirical relationship between mental illness and suicide" or suicide attempts is uncertain and that a suicide attempt need not always signal "an inability to perceive reality accurately, to reason logically and to make plans and carry them out in an organized fashion." Greenberg, Involuntary Psychiatric Commitments to Prevent Suicide, 49 N. Y. U. L. Rev. 227, 234, 236 (1974). See also Pokorny, Myths about Suicide, in Suicidal Behaviors 64–65 (H. Resnik ed. 1968).

[17] In reaching this conclusion we have not relied on the testimony of the psychiatrists at the Rule 27.26 hearing, which, we agree with

aborted the trial is a hard reality, but we cannot fail to note that such a result might have been avoided by prompt psychiatric examination before trial, when it was sought by petitioner.

## V

Our resolution of the first issue raised by petitioner makes it unnecessary to decide whether, as he contends, it was constitutionally impermissible to conduct the remainder of his trial on a capital offense in his enforced absence from a self-inflicted wound. See *Diaz* v. *United States,* 223 U. S. 442, 445 (1912). However, even assuming the right to be present was one that could be waived, what we have already said makes it clear that there was an insufficient inquiry to afford a basis for deciding the issue of waiver. Cf. *Westbrook* v. *Arizona,* 384 U. S. 150 (1966); *United States* v. *Silva,* 418 F. 2d 328 (CA2 1969).

The Missouri Court of Appeals concluded that, had further inquiry into petitioner's competence to stand trial been constitutionally mandated in this case, it would have been permissible to defer it until the trial had been completed. Such a procedure may have advantages, at least where the defendant is present at the trial and the appropriate inquiry is implemented with dispatch. See Note, 81 Harv. L. Rev., at 469; *Hansford* v. *United States,* 127 U. S. App. D. C. 359, 360, 384 F. 2d 311, 312 (1966) (rehearing en banc denied) (statement of Leventhal, J.); *Jackson* v. *Indiana,* 406 U. S., at 741. However, because of petitioner's absence during a critical stage of his trial, neither the judge nor counsel was able to observe him, and the hearing on his motion for a new trial, held approximately three months after the trial, was not informed by an inquiry into either his competence to stand

the Missouri Court of Appeals, is not relevant to the question before us.

trial or his capacity effectively to waive his right to be present.

The question remains whether petitioner's due process rights would be adequately protected by remanding the case now for a psychiatric examination aimed at establishing whether petitioner was in fact competent to stand trial in 1969. Given the inherent difficulties of such a *nunc pro tunc* determination under the most favorable circumstances, see *Pate* v. *Robinson,* 383 U. S., at 386–387; *Dusky* v. *United States,* 362 U. S., at 403, we cannot conclude that such a procedure would be adequate here. Cf. *Conner* v. *Wingo,* 429 F. 2d, at 639–640. The State is free to retry petitioner, assuming, of course, that at the time of such trial he is competent to be tried.

The judgment is reversed, and the cause is remanded for proceedings not inconsistent with this opinion.

*Reversed and remanded.*