UNITED STATES of America,

v.

**Ever SANDOVAL, Defendant.**

**No. 02 CR 333(NG)(MDG).**

United States District Court,
E.D. New York.

April 15, 2005.

be competent, is not competent to stand trial.

■ Proceedings regarding the question of this defendant's competence have been protracted. In fact, on two earlier occasions, I concluded that the defendant was competent. Since then, there have been further evaluations and further conclusions by counsel, as well as further observations by the court and an evidentiary hearing. The burden after a hearing is on the defense to prove by a preponderance of the evidence that the defendant is not competent to proceed. *See Cooper v. Oklahoma,* 517 U.S. 348, 362, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996). I have concluded, based upon the entire lengthy record in this case, that the burden has been met.

Peter Kirschheimer, The Legal Aid Society Federal Defender Division, Brooklyn, NY, Robert L. Moore, Quesada & Moore, LLP, West Hempstead, NY, for Defendant.

Sean Haran, The U.S. Attorney's Office, Brooklyn, NY, for Plaintiff.

## *OPINION*

GERSHON, District Judge.

This opinion follows my March 10, 2005 Order, with opinion to follow, committing defendant Ever Sandoval to the custody of the Attorney General, pursuant to 18 U.S.C. 4241(d), based upon my finding that defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. The commitment order arose out of an application by defendant's counsel for a finding that Mr. Sandoval, who claims to

### Background

The defendant is before the court on charges of conspiracy to import heroin and conspiracy to possess and distribute heroin. The claim is that the defendant, in a controlled delivery, knowingly received a package of heroin that was sent from his native country, Colombia. Because of the quantity of heroin involved, if convicted, the defendant faces a mandatory minimum penalty that includes a term of imprisonment of not less than 10 years. The record reflects a plea offer from the government under which the mandatory minimum would be limited to five years. Tr. of Sept. 4, 2003 at 11. In addition, defendant's counsel has indicated that, if there were a plea of guilty, the defendant could be eligible for the "safety valve" provision of United States Sentencing Commission, *Guidelines Manual,* 5C1.2, which would permit a sentence below the mandatory minimum; indeed, potentially, the guidelines range would be as low as 46–57 months.

The defendant has had three court-appointed lawyers—the first, very briefly,

was Peter Kirchheimer, Esq., of the Legal Aid Society; the second was Robert L. Moore, Esq.; and currently Peter E. Quijano, Esq., is representing the defendant. From early on, in writings to the court and in open court, the defendant has set forth his bizarre views about the nature and history of the United States, the difference between an "attorney" and a "counselor," and the significance of the Uniform Commercial Code ("U.C.C.") and the copyright laws, which he believes will somehow help him to defend against this drug prosecution. The defendant has also filed liens against the court, Mr. Moore, and the prosecutor, claiming that the use of his name is a copyright violation and that, among other things, every time someone in court calls him by name, that person owes him one million dollars.[1]

When the government first raised the issue of competency, the parties were asked to file papers and, based upon Mr. Moore's conclusion that the defendant was competent, the government withdrew its request for a psychiatric evaluation. In September of 2002, the court accepted Mr. Moore's conclusion of competence.

Later, when the defendant's bizarre communications continued, I ordered him examined. A report dated March 3, 2003, from Dr. William J. Ryan, a psychiatrist with the Bureau of Prisons, found him to be incompetent as suffering from a delusion. A report dated May 10, 2003, from L. Thomas Kucharski, a psychologist with the Bureau of Prisons, found that his "unusual legal beliefs and attitudes" are not delusional and did not make him incompetent. A June 3, 2003 report by Dr. Azariel Eshkenazi, a psychiatrist retained by Mr.

Moore, found the defendant incompetent as suffering from a delusion that made him unable to assist in his defense. On June 18, 2003, Dr. Ryan filed a second report reversing his earlier opinion and finding the defendant competent on the ground that his unusual legal views were merely part of a subculture of other inmates with similar views.

In response to these reports, Mr. Moore expressed the view that there was a viable defense which he was able to discuss with the defendant and that he was satisfied that the defendant could competently go to trial. AUSA Sean Haran concurred, and both counsel agreed that no hearing was necessary. Relying heavily on defense counsel's views as to the defendant's ability to work with counsel, I concluded, on July 17, 2003, in an oral ruling, that the defendant was competent.

The case proceeded toward trial, to begin on September 29, 2003. But shortly before the trial was to begin, the defendant sent a "Letter Rogotory," dated August 6, 2003, to the court expressing his apparent wish to plead guilty, but also containing many incomprehensible but legalistic sounding statements including a demand that the court "return" for "value" an "invoice" in exchange for his plea. At a conference on September 4, 2003, called to address this latest development, Mr. Moore expressed concern that the letter, sent to the court without his knowledge or advice, might be viewed as containing a judicial admission of guilt. Mr. Moore further stated that, at the time the court, earlier, had found Mr. Sandoval competent, Mr. Sandoval had assured him that

---

1. Ultimately, in a proceeding before another judge of this court, the liens were removed and defendant was directed not to serve additional liens. The government relies on the defendant's abiding by this direction as a sign that he is competent. The issue, however, is

not whether the defendant is capable of obeying court orders; it is whether he is capable of "understand[ing] the nature and consequences of the proceedings against him" and of "assist[ing] properly in his defense." *See* 18 U.S.C. 4241(d).

he was able to separate his concepts regarding the U.C.C. from his criminal case, but that, since receiving the August 6, 2003 missive, he had spoken to the defendant for several hours, and the defendant was no longer willing to do that. That is, he would not separate his criminal case from the U.C.C. Mr. Moore further stated that he had advised the defendant to go to trial and not to plead guilty, but that it was the defendant's choice to plead guilty. In light of that, Mr. Moore had attempted to go through the process of pleading guilty with him, but they could not get through the factual allocution; indeed, Mr. Sandoval would not tell him what he would say in response to the court's anticipated questions. Mr. Moore also expressed a concern that a plea would be invalid because it would be based on Mr. Sandoval's view that pleading guilty would not matter because he would somehow be protected by the U.C.C. Tr. of Sept. 4, 2003 at 6–10. Mr. Sandoval would no longer talk to him about the facts of the case. Tr. of Sept. 4, 2003 at 12.

The defendant then spoke:

It's very simple, your Honor, the purpose that I wrote this letter is to close the account, the 14 points are very clear, very concise, one by one. Last November 8th I offer a private contract to Mr. Moore which he denied and refused to sign it. Now I'm aware and this Court knows since I'm not an officer of this Court I have no jurisdiction, that's why last time.... That's why the Court last time denied my offer to plead guilty. I'm not an officer from this Court to be able to accept the charges and to discharge them too. Correct. Mr. Moore, Mr. Moore represents my strong man. He can do the acceptance on my behalf. That's what I'm doing in this letter of rogotory. It's very simple what I want to do, To honor this court, to honor it and to close the case. In addition to this, in the letter I talk about the operation of the person of honors in which and I register it in the secretary, the ministry of state. I gave it true value to the true bill. My intention actually if Mr. Moore denies or refuses to accept this letter of mine, I have to change attorneys because there is a conflict of interest created between him and me. We haven't understood each other in during a year time, he has always contradicted me. The last time he went to talk to me he was threatening me, intimidating me, telling me I will get between ten and fifteen years, that I'm going to be locked up in a crazy hospital, I will never be able to get out of there again. Then all of a sudden I don't want this to become a personal issue. I also have a civil lawsuit according to the UCC which of course has nothing to do with this process here. I think it's a big conflict created here already. And if this Court or your honorable Judge decides that Mr. Moore whether to continue or not in this process, it would be the Court's decision then. Again, I talk to you about my culpability in the letter, it's very clear and it's based on this letter specifically. Thank you very much.

Tr. of Sept. 4, 2003 at 14–16. After the prosecutor then spoke, the following exchange took place:

THE DEFENDANT: Can I ask the prosecutor, the government representative, do you represent the corporation or the United States?

MR. HARAN: Excuse me?

THE DEFENDANT: Do you represent the corporation or the United States?

MR. HARAN: I represent the United States government.

THE DEFENDANT: The United States of America or the corporation of the United States of America?

THE COURT: Mr. Sandoval, I will interrupt you because these are not appropriate questions. You have a misguided sense of what the United States is. The United States is a nation and Mr. Haran represents the United States government and your discussions about corporations are wrong.

Tr. of Sept. 4, 2003 at 16–17.

Ultimately, Mr. Sandoval made clear that he wanted Mr. Moore to be relieved, and Mr. Moore did not oppose that request, which was granted. *See* Tr. of Sept. 4, 2003 at 17–22.

Peter E. Quijano, Esq., a highly experienced attorney and native Spanish speaker, was then appointed. Mr. Quijano, in a letter dated September 18, 2003, wrote to the court that, after reviewing the entire file and conducting lengthy meetings with the defendant, the defendant appeared to be in an intractable delusional state that prevented him from understanding the proceedings and being able to assist meaningfully in his defense. Mr. Quijano reported that Mr. Sandoval was "altogether incapable of appreciating and understanding, rationally and factually, the nature of the proceedings against him. Mr. Sandoval's present state of mind appears to be so disoriented as to render him completely unable to assist in his defense. Indeed, he appears to be the prisoner of his own gibberish." Quijano letter of Sept. 18, 2003 at p. 6. As a result, at counsel's request, I ordered that Mr. Sandoval be examined at Butner Federal Medical Center, in order to determine whether he was competent. Dr. Robert Cochrane and Dr. Bryon Herbel, staff psychologist and psychiatrist, respectively, in the Mental Health Department of the Butner Federal Medical Center, submitted a joint report finding the defendant competent.[2] *See* Butner Report at 16. Subsequently, at defense counsel's request, I further ordered an examination by Dr. Robert H. Berger, M.D., a professor of psychiatry at New York University School of Medicine. Dr. Berger concluded that the defendant is competent but that that conclusion could change if the defendant continued to hold to his views as the trial approached. *See* Berger Report at 10; Tr. of Oct. 21, 2004 at 61.

An evidentiary hearing was then held on four dates between October 14, 2004 and December 9, 2004, and further submissions were made to the court after the hearing. The record of proceedings before the court includes all of the reports identified above. At the hearing, the court heard the testimony of Drs. Ryan, Kucharski, Cochrane and Berger.

*Discussion and Findings*

18 U.S.C. 4241(d) provides that:

If, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General.

In making a determination of competency, "it is not enough ... that the defendant is oriented to time and place and has some recollection of events." *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). Nor is it enough that "the defendant can make a recitation of the charges ... for proper assistance in

**2.** The March 25, 2004 Report of Drs. Cochrane and Herbel (the "Butner Report") incorrectly states that the defendant was hospitalized pursuant to Section 4241(d). The defendant was evaluated by Drs. Cochrane and Herbel pursuant to 18 U.S.C. 4241(b).

the defense requires an understanding that is 'rational as well as factual.' " *United States v. Hemsi*, 901 F.2d 293, 295 (2d Cir.1990) (quoting *Dusky*, 362 U.S. at 402, 80 S.Ct. 788). It is undisputed that the defendant is not, in fact, assisting rationally in his own defense. In fact, he is not communicating with counsel at all. The issue in dispute, then, is whether the defendant's conduct is the result of a delusional disorder or the result of his own "volition."

All of the medical professionals agreed that Mr. Sandoval appears to be sincere; that is, it is most likely that he is not malingering. Mr. Sandoval denies that he is incompetent, and the doctors found that he is attempting to present himself in a favorable light. It is also agreed that the only potential mental disease or defect afflicting Mr. Sandoval is a delusional disorder. A delusion is defined as "a false belief based on incorrect inferences about external reality," which false belief is "firmly and rigidly held in spite of evidence to the contrary." Berger Test., Tr. of Oct. 21, 2004 at 17; *see also* Diagnostic Statistical Manual ("DSM") IV 297.1 (1994). He otherwise presents a normal appearance and mental status.

All of the doctors expressed that the defendant was polite and seemingly cooperative with them. Indeed, they placed great emphasis on that fact as well as on his "normal" appearance. Nonetheless, a close reading of their reports and of the testimony revealed that the cooperation Mr. Sandoval displayed lasted only until the doctors attempted to press him as to the nature of his bizarre thinking. The defendant controlled the interviews with the doctors and stopped talking with the

doctors when they attempted to explore the thinking that was the basis for the court's order that he be examined. They were therefore utterly unable to determine the source of his beliefs or the motivations behind them. As Dr. Berger put it, "I still am not aware of the mental process that's preventing him from functioning in the way that he needs to function, which is to assist in his defense." Tr. of Oct. 21, 2004 at 59. Similarly, Dr. Kucharski's report, at p. 5, states that Mr. Sandoval's refusal to respond to questions regarding his beliefs prevented the doctor from obtaining a "comprehensive psychological history and diagnostic evaluation."

As a result, with the exception of Dr. Berger, the testifying doctors' conclusions that he was not delusional rested principally on the fact that others shared Mr. Sandoval's views and not on an evaluation of his actual state of mind, which they were unable to penetrate. That is, with the exception of Dr. Berger, the doctors relied heavily on the existence of what was referred to by Dr. Cochrane as a "subcultural" belief system. *See* Tr. of Dec. 9, 2004 at 25, 124.[3] They concluded that, because other inmates have similar views regarding the U.C.C. and the copyright laws as does Mr. Sandoval, Mr. Sandoval's bizarre ideas should not be considered delusional.

Based upon the testimony at the hearing, I conclude, however, that the fact that other inmates express similar views does not foreclose the possibility that the defendant, in his adherence to these views, is delusional. See Tr. of Oct. 21, 2004 (Berger) at 23–24. One element of Dr. Berger's testimony, in fact, speaks directly to the concept underlying the court's conclusion:

---

**3.** Dr. Kucharski, under questioning from Mr. Quijano, stated that he would like to "back off from" the word "subculture," as it is used in sociology. However, he indicated that the term generally was an accurate reflection of his views of Mr. Sandoval's belief system and its relationship to the belief systems of others.

I don't hold, one, that merely because you're a part of a subculture and you have a belief that goes along with some of the elements that the subculture has that it automatically isn't a delusion . . . . it is conceivable, even if one were to identify that there is a UCC subculture out there, that it is possible nonetheless that Mr. Sandoval is approaching the ideas and the concepts in a way that the others aren't. Perhaps more firmly held, more firmly believed, maybe taking them to a point where they're actually working against his own self interests or harming him, whereas other people in the subculture might not do that.

Tr. of Oct. 21, 2004 at 20–21. In spite of this possibility, none of the doctors who relied on the views of other inmates addressed the peculiar word usage and formulations used by the defendant and compared them to the formulations used by other inmates. Examination of materials from a website submitted by the government shows that the defendant's attempted use of the concepts discussed on the website is different from their use on the website.[4] *See* Government's Exhibits 1A–1J (pages from securedparty.org website).

The apparently self-defeating nature of Mr. Sandoval's adherence to his views supports the conclusion that his adherence is not volitional. It was not disputed that acting contrary to one's interests may be indicative of delusional, rather than volitional, behavior, yet the doctors were unaware of any benefit that the defendant was receiving from acting as he is doing. *See Drope v. Missouri*, 420 U.S. 162, 179, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) ("Too little weight was given to the testimony of petitioner's wife that on the Sunday prior to trial he tried to choke her to death. For a man whose fate depended in large measure on the indulgence of his wife, who had hesitated about pressing the prosecution, this hardly could be regarded as rational conduct."). While recognizing that acting against one's self interest was relevant, though not determinative, to a finding of incompetence, Dr. Berger did not conclude that Mr. Sandoval's behavior was necessarily hurting him and stated: "I would be willing to come back and evaluate him if at some point in the future it does start to hurt him." Tr. of Oct. 21, 2004 at 61.

■ Especially given the limitations of the forensic evaluations, I rely heavily, as I

---

4. The government submits that the defendant's belief system is part of an even broader subculture—one that apparently maintains its manifesto at the web address securedparty.org. Indeed, many of the concepts discussed on this website are highly similar to the views expressed by the defendant. But the website is insufficient to undermine the evidence that the defendant is incompetent. First, it is not clear that the website is actually a manifestation of a belief system held by a large number of people, as opposed to a form of satire or perhaps a blueprint for deliberate frustration of the court system. No proof has been introduced verifying that the ideas expressed on the website are connected to a group of people who actually believe such concepts, as the defendant does. Furthermore, that the website apparently charges

$1200 to individuals in order to learn its "educational program" suggests the possibility of intentional fraud. *See* Exhibit 1B at 3. Second, parts of the website appear to acknowledge that it espouses a belief system that is divergent from the set of beliefs held by the majority of the public. Indeed, the tone of much of the website is the language of argument and the attempt to convince. *See, e.g.,* Exhibit 1B at 1 ("All governments are corporate for profit operations. Read any newspaper: The U.S. Government (Trust) and its agencies (sub-Trusts) bring suits against people and other government (Trust) entities every day."). This differs greatly from the unquestioning statements of the defendant. Rather than attempt to convince others, the defendant takes for granted that these concepts are all true.

did when initially finding the defendant competent, on the opinions of defense counsel. The doctors relied heavily on Mr. Moore's initial conclusion that the defendant was able to separate his views on the U.C.C. and the copyright laws from the law applicable to his defense, but did not take into account Mr. Moore's statements at the September 8, 2003 hearing, described above, which indicated his utter inability to get through to Mr. Sandoval and Mr. Sandoval's unwillingness any longer to separate the concepts. Nor did they appear to give Mr. Quijano's views the same consideration they gave to Mr. Moore's initial views. As noted above, Dr. Berger concluded that he did not know whether the defendant's actions were self-defeating, despite Mr. Quijano's belief, based on his years of experience as a defense lawyer, that they were.

In contrast to the doctors, I do give the lawyers' views significant consideration. While not alone determinative, the Supreme Court and the Second Circuit have recognized the importance of considering counsel's judgment about the defendant's state of mind. *See Cooper*, 517 U.S. at 352, n. 1, 116 S.Ct. 1373; *Medina v. California*, 505 U.S. 437, 450, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992); *Drope*, 420 U.S. 162, 177 n. 13, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *United States v. Quintieri*, 306 F.3d 1217, 1233 (2d Cir.2002), *cert. denied*, 539 U.S. 902, 123 S.Ct. 2246, 156 L.Ed.2d 110 (2003); *United States ex rel. Roth v. Zelker*, 455 F.2d 1105, 1108 (2d Cir.1972), *cert. denied*, 408 U.S. 927, 92 S.Ct. 2512, 33 L.Ed.2d 340 (1972). As the Second Circuit stated in *Roth*, "[t]he opinion of a defendant's attorney as to his ability to understand the nature of the proceedings and to cooperate in the preparation of his defense, is indeed significant and probative." 455 F.2d at 1108. In fact, the Supreme Court stated in *Medina:*

Although an impaired defendant might be limited in his ability to assist counsel in demonstrating incompetence, the defendant's inability to assist counsel, can, in and of itself, constitute probative evidence of incompetence, and defense counsel will often have the best-informed view of the defendant's ability to participate in his defense. *E.g., United States v. David* ... 511 F.2d 355, 360 (1975); *United States ex rel. Roth v. Zelker*, 455 F.2d 1105, 1108 (CA2), *cert. denied*, 408 U.S. 927, 92 S.Ct. 2512, 33 L.Ed.2d 340 ... (1972).

505 U.S. at 450, 112 S.Ct. 2572. As Chief Judge Bazelon said in *David*, cited approvingly in *Medina*, "counsel's firsthand evaluation of a defendant's ability to consult on his case and to understand the charges and proceedings against him may be as valuable as an expert psychiatric opinion on his competency." 511 F.2d 355, 360 (D.C.Cir.1975). *See also* Grant H. Morris, J.D., LL.M., Ansar M. Haroun, M.D. and David Naimark, M.D., 4 Hous. J. HEALTH L. & POL'Y 193, 234 (2004) (stating that psychiatrists and psychologists "can explain how a person's mental disorder affects, or may affect, his or her understanding of issues and decision making capability. But they are not expert in deciding whether the defendant has a 'sufficient' ability to consult with his or her attorney or has a 'reasonable' degree of rational understanding. Those decisions are legal policy decisions appropriately within the province of the judge.").

Mr. Moore, who initially fought strenuously for the view that Mr. Sandoval was competent, ultimately acknowledged that it had become impossible for him to have meaningful discussions with Mr. Sandoval regarding his defense. Mr. Quijano has been unequivocal in his view that the defendant is not competent to proceed. *Cf. Roth*, 455 F.2d at 1109 ("Roth's acceptance

of the advice of counsel is not at all indicative of a lack of rationality.").

Finally, the court's own observations, informed by the testimony of the forensic witnesses, are relevant. *See Quintieri,* 306 F.3d at 1233; *Hemsi,* 901 F.2d at 295, 296; *see also United States v. Vamos,* 797 F.2d 1146, 1150 (2d Cir.1986) ("deference is owed to the district court's determinations based on observation of the defendant during the proceedings."), *cert. denied,* 479 U.S. 1036, 107 S.Ct. 888, 93 L.Ed.2d 841 (1987). The defendant's statements quoted earlier in this opinion are a small sample of innumerable statements that he has made evidencing his inability to separate his peculiar views of the civil law from the law applicable to this criminal case.

Of course, many people have views of the government, the prosecution, or the facts of their case that are outside the mainstream. I do not suggest that one must give up one's views, however out of the mainstream, in order to defend against a criminal case. The issue is whether the defendant has the mental capacity to recognize that, whatever views he may hold, his criminal defense requires that he work with an attorney within the realities of the criminal justice system and the laws that will affect the result in his case.

Nor does this appear to be a case where the defendant has deliberately chosen an obstructive path, based upon his personal views, in order to make a political or other point. Indeed, the defendant's acknowledgment to the court of his factual guilt seems to belie an intention to simply obstruct the process and achieve some benefit from doing so.

The defendant's rigid adherence to his erroneous views also supports the finding that he is incompetent. All of the doctors agreed that a rigid adherence to fanciful views and an inability to explore their cor-

rectness is one factor indicating that a delusional process is at work. Although the defendant stated that he would consider evidence that his views were incorrect, when confronted, for example, by Dr. Cochrane, with such evidence, he would not in fact consider it, but held rigidly to his views. As Dr. Berger concluded, Mr. Sandoval was never serious about reviewing documents contradicting his views. Tr. of Oct. 21, 2004 at 63. This conclusion comports fully with the my evaluation of Mr. Sandoval, who rigidly adhered in court to his views, no matter how patiently a contrary view was explained to him. *See also* Govt. Ex. 11 (transcript of proceedings regarding liens filed by Sandoval). As Dr. Berger testified, "being able to compartmentalize these two things [the U.C.C. and the criminal case] is something that would be needed to be competent. It is the inability to differentiate the two issues and the contamination of one onto the other that would undermine his competence." Tr. of Oct. 21, 2004 at 10. Here, the doctors, unwilling to press the defendant regarding his views, apparently did not experience the degree of rigidity experienced by counsel and the court.

The bizarreness and apparent singularity of Mr. Sandoval's views is evidenced further by the fact that, on occasion, our able court interpreters would turn to me, when attempting to translate the defendant's comments in court, and say that the defendant was using formulations that were not in fact words in either Spanish or English; these formulations had a "legal" ring to them in that, for example, some began with "jur," but they were untranslatable. This supports the conclusion that, while Mr. Sandoval's unusual views may have originated with other inmates, in his mind these views have become gibberish.

█ The right of an incompetent defendant not to stand trial is a fundamental

and deeply rooted right entitled to constitutional protection under the Due Process Clause. "For the defendant, the consequences of an erroneous determination of competence are dire. Because he lacks the ability to communicate effectively, he may be unable to exercise other rights deemed essential to a fair trial." *Cooper*, 517 U.S. at 364, 116 S.Ct. 1373. The *Cooper* court further stated that, "[b]y comparison to the defendant's interest, the injury to the State of the opposite error—a conclusion that the defendant is incompetent when he is in fact malingering—is modest." *Id.* at 365, 116 S.Ct. 1373. Thus, *Cooper*, while recognizing the difficulty of knowing "where the truth lies," found it a violation of due process to require that a defendant prove incompetence by a heightened, clear and convincing, standard of proof. *Id.* at 369, 116 S.Ct. 1373.

A preponderance of the evidence indicates that the defendant in this case is not competent to stand trial. Neither the conclusions of the forensic evaluators nor the documents produced by the government are sufficient to counter the observations of the court and the judgment of defense counsel. In sum, the defendant cannot be justly tried, and in accordance with the order of March 10, 2005, he has been committed to the custody of the Attorney General for treatment and evaluation.