Harry NICKS, Petitioner,

v.

UNITED STATES of America,
Respondent.

No. 89 Civ. 5155 (CSH).

United States District Court,
S.D. New York.

Oct. 19, 1993.

Mary Jo White, U.S. Atty. S.D.N.Y., New
York City (Stephen Fishbein, of counsel), for
U.S.

Ropes & Gray, Boston, MA (William L.
Patton, Laurie R. Wallach, Akiyo Fujii, of
counsel), Cahill Gordon & Reindel, New York
City (Laurence T. Sorkin, of counsel), for
Harry Nicks.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Harry Nicks petitions for a writ of error *coram nobis* to vacate his 1974 conviction and 1975 sentencing in this Court on a plea of guilty before Judge Knapp to a charge of armed bank robbery. Judge Knapp granted Nicks' *coram nobis* petition. The Court of Appeals reversed and remanded the case to a non-participating district judge, Judge Knapp having indicated that he would recuse himself in such an eventuality. *Nicks v. United States*, 955 F.2d 161 (2d Cir.1992). The Second Circuit's remand order directs this Court to consider the threshold question whether Nicks had "sound reasons" for his delay in seeking *coram nobis* relief. If he did not, this Court must dismiss the petition. If sufficient reason exists to excuse the delay, this Court must decide whether a competency hearing was in fact constitutionally required at the time of Nicks' plea and sentencing in 1974 and 1975. *Id.* at 167–68. The parties have briefed the first of these questions, which this opinion addresses.

For the reasons that follow, I hold that the passage of time does not bar Nicks' petition.

### I

The Second Circuit's opinion contains a detailed factual statement at 955 F.2d 162–66. I reiterate the facts only to the extent necessary to explain my conclusion.

On June 17, 1974 Nicks pled guilty before Judge Knapp to armed bank robbery in violation of 18 U.S.C. § 2113(d). Nicks was represented by Thomas J. Concannon, Esq. of the New York Federal Defender Services Unit. Following a plea allocution satisfactory to Judge Knapp, Concannon assured the district judge that Nicks "seems to understand very well what he is doing." Judge Knapp observed that Nicks did not appear to him to be "under any mental condition."

Notwithstanding Concannon's reassurances to the district judge at the time of plea, he thereafter requested Judge Knapp to order a psychiatric examination of Nicks pursuant to 18 U.S.C. § 4244. Judge Knapp entered that order on July 2, 1974. A psychiatrist examined Nicks and reported his findings to the District Court in a letter dated July 15, 1974. That letter prompted Judge Knapp to enter an order on July 25, 1974 committing Nicks to the Bureau of Prisons for an additional 60-day study under Section 5010(e) of the Federal Youth Corrections Act. Nicks was housed at the Federal Correctional Institution in Milan, Michigan, and examined by a psychiatrist and a psychologist, who recommended that Nicks be sentenced to an eight year indeterminate sentence under Section 5010(c) of the Federal Youth Corrections Act. Nicks came before Judge Knapp again for sentencing on January 16, 1975. Having received further reassurances from Concannon with respect to Nicks' understanding of the charges and the consequences of his plea, Judge Knapp sentenced Nicks to an indeterminate term of up to eight years under the Federal Youth Corrections Act.

At no time did Judge Knapp hold a competency hearing. That omission lies at the heart of Nicks' *coram nobis* petition.

Nicks was released from federal custody on May 27, 1980. In January 1978, and again in February of that year, federal authorities temporarily transferred Nicks to New Jersey custody, where he was tried twice for narcotics and weapons possession offenses. The first trial found him guilty on charges of cocaine and weapons possession. The second trial found him guilty on a charge of cocaine possession. The New Jersey court sentenced Nicks to terms of imprisonment running concurrently with each other but consecutively to the federal sentence. The New Jersey authorities paroled Nicks in 1982.

In the early spring of 1983 Nicks was arrested in Alabama on charges of robbery, attempted murder, first-degree murder, murder and capital murder. These charges arose out of an armed robbery of a pawn shop on March 5, 1983. The Alabama court convicted Nicks of the capital charge of murder committed during a first degree robbery. The trial judge accepted the jury's verdict in favor of a death sentence. In the sentencing proceeding following conviction, Nicks' 1974 Southern District of New York bank robbery conviction was treated as one of two aggrava-

ting circumstances warranting imposition of a sentence of death.[1] The Alabama appellate courts rejected Nicks' direct appeal from his conviction and death sentence. *Nicks v. State*, 521 So.2d 1018 (Ala.Crim.App.1987), *aff'd*, 521 So.2d 1035 (Ala.1988). The United States Supreme Court *denied certiorari*, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988), 487 U.S. 1263, 109 S.Ct. 27, 101 L.Ed.2d 977 (1988) (petition for rehearing).

In January 1989, Nicks petitioned the Alabama court for post-conviction relief, including in the grounds a claim that his 1974 federal bank robbery conviction in this Court should not have been used as aggravating circumstance. In July 1989 Nicks filed the instant writ of error *coram nobis* seeking to vacate that 1974 conviction. He asserts that Judge Knapp's failure to conduct a competency hearing violated his due process rights and rendered his guilty plea void. Judge Knapp granted relief. The government appealed and obtained the reversal and remand which brings the case before this Court. The Alabama post-conviction petition has been held in abeyance.

## II

As noted, this Court's first function on remand is to determine "whether Nicks had 'sound reasons' for his lengthy delay in seeking *coram nobis* relief." 955 F.2d at 167. The Second Circuit derived the quoted phrase "sound reasons" from *United States v. Morgan*, 346 U.S. 502, 512, 74 S.Ct. 247, 253, 98 L.Ed. 248 (1954), a case in which, according to the Second Circuit in *Nicks*, "[t]he Supreme Court further instructs *coram nobis* relief should issue only when 'sound reasons exist [ ] for failure to seek appropriate earlier relief.'" *Id.* at 167. On the appeal from Judge Knapp's order granting Nicks relief, the Second Circuit concluded that "[o]n the present record, we cannot determine whether Nicks has delayed too long." *Id.* at 167. Hence, the remand and the issue presently before this Court.

The Second Circuit's interpretation of *Morgan* dispels the notion, echoed in Nicks' briefs, that a constitutional error at the time of plea or sentence voids the conviction absolutely, so that *coram nobis* relief is subsequently available without any regard for the passage of time. The Second Circuit view, binding upon this Court, is that *coram nobis* may be barred by the passage of time; and the timeliness of a *coram nobis* petition must be determined on a case-by-case basis, with full regard for the attendant circumstances.

The principle that conduct is barred if untimely proceeds from the tenet that what one could have done earlier, one should have. In litigation matters, that tenet implicates the cognitive awareness of the party (Nicks in this case) and the professionalism and resources of the attorneys representing the party.

These propositions inform the government's professed perception of Harry Nicks. Urging that his *coram nobis* petition was untimely, the government's brief portrays Nicks as an intelligent, experienced litigant, devising strategy and dictating tactics. That capacity is the *alpha* and *omega* of the government's portrayal of Nicks. "In the years following his 1974 guilty plea," we read on page 1 of the government's brief, "Nicks was an active litigant who was capable of asserting his rights and often did." In its concluding paragraph on p. 34, the government expands on that theme. "In the years after his 1974 guilty plea, Nicks was an active litigant who simply chose not to pursue the competency claim that he now asserts," so that any delay in pursuing *coram nobis* "is the result of Nicks' conscious choice and is not attributable to any legal bar or lack of knowledge on Nicks's part." In those stated circumstances, the government concludes, Nicks' delay cannot be excused.

This portrait of Nicks is entirely untenable. It flies in the face of the medical evidence, derived for the most part from the government's own files.

---

1. The other aggravating circumstance found by the Alabama trial judge was that the murder was committed during the commission of a robbery. That circumstance is not implicated by the *coram*

*nobis* petition at bar. The parties appear to agree, however, that Nicks' 1974 conviction in this Court had a substantial adverse impact upon his Alabama sentencing.

Dr. Norman Weiss, the psychiatrist who examined Nicks pursuant to Judge Knapp's July 2, 1974 order, determined that Nicks was "mentally retarded and probably borderline psychotic based on the poorly organized thought processes and delusional, primitive thinking." Dr. Weiss concluded that since Nicks' decision about his plea "was based in part on disordered thinking, interfering with proper judgment, I question his competency." The study performed pursuant to Judge Knapp's July 25, 1974 order was conducted by a psychiatrist, Dr. Peter Davol, and a psychologist, Dr. Thomas Rosenbaum. Dr. Davol diagnosed Nicks as suffering from a "major psychotic illness." Dr. Rosenbaum diagnosed Nicks as suffering from "schizophrenia, paranoid type (acute and severe)" with a "poor" prognosis for successful treatment and a need for "immediate psychiatric treatment."

These diagnoses did not augur well for the stability of Nicks' federal incarceration. And in fact, Nicks' troubled years in federal confinement give compelling evidence of severe and chronic mental illness.

Judge Knapp sentenced Nicks on January 16, 1975. He was incarcerated at the Federal Correctional Institute at Petersburg, Virginia, and placed in the general prison population. As early as February 14, 1975, Nicks exhibited delusional and paranoid conduct. On March 28, 1975 the Bureau of Prisons transferred Nicks to the medical center for federal prisoners at Springfield, Missouri for observation and treatment. Nicks remained at Springfield until September 26, 1975. The examining psychiatrist concluded that "there is no question but that this man suffers from chronic paranoid schizophrenia...." Nicks was returned to FCI Petersburg in October 1975; but on April 22, 1976 the chief of psychology services at that institution requested that Nicks be transferred back to Springfield because Nicks "is only in partial remission from his previously diagnosed psychosis," and was "becoming highly suspicious, shows paranoid ideation, and has become negativistic." One can sense the concern of Dr. Wallace, the Petersburg staff member who authored the April 22, 1976 memorandum, which concluded: "Hopefully, [Nicks] will be transferred as soon as possible."

· From April 29, 1976 to June 13, 1976 Nicks was hospitalized at Springfield. He returned to Petersburg on June 14, 1976, but only one month later had to be readmitted to Springfield, where he was treated from July 23, 1976 to July 15, 1977. Nicks was returned to Petersburg in July 1977, but could be maintained there for only two months, and was then transferred to the mental health division at FCI, Butner, North Carolina. Nicks was at Butner from September 23, 1977 to May 1, 1978, except for periods of absence to respond to the New Jersey charges. Nicks was returned to FCI Petersburg on May 1, 1978, but within a few weeks had to be transferred again to Springfield, where he remained until October 1978. Nicks returned to Petersburg at that time, but two months later, at the request of the Petersburg warden, Nicks was readmitted to the mental health division at Butner where he remained until his release from federal custody in May 1980.

The medical authorities at Springfield and Butner constantly prescribed various medications for Nicks, although they occasionally encountered a difficulty in persuading Nicks to take the medication. Continuing medication was prescribed for Nicks during the Bureau of Prisons' repeated efforts to house Nicks in the general prison population at Petersburg. But Nicks could never be maintained in that population for more than a few weeks at a time. His mental condition always deteriorated, requiring Nicks' hospitalization at either Springfield or Butner. In short, Nicks' entire period of federal incarceration was marked by severe mental illness which the prison medical authorities attempted without success to stabilize and remedy.

Nicks was in New Jersey custody from 1980 to 1982. The records covering that period of time are not as complete. There is no reason to think, however, that Nicks' mental condition improved during that incarceration. Nicks was arrested on the Alabama charges in 1983. Both his Alabama trial and appellate counsel testified under oath in the Alabama *habeas corpus* proceeding that be-

cause of his mental condition, Nicks could not assist them in preparing his defense.

From this sad history of mental instability and medication ineffective to achieve lasting benefit, the government culls one statement by Nicks as evidence of his "keen awareness of his predicament and a willingness to make himself heard." Brief at 26. During his first New Jersey trial this exchange occurred:

> Defense Counsel: I would like to make a comment about Mr. Nicks' testifying. He has—he is testifying. And he has told me from the very beginning of this case that he intends to testify. However the fact that he is going to testify is against my advice. . . .
>
> The Court: Mr. Nicks, may I ask have you conversed with Mr. DiChiara—
>
> Mr. Nicks: Yes, I have.
>
> The Court: —about testifying?
>
> Mr. Nicks: Sir, I don't feel there is no one that's more capable and qualified as me to sit up on the witness stand and try to defend my own case. At least I would be able to speak what is on my mind and then they can take me off to the County. That's what's going to happen.
>
> The Court: Do you understand what he has said to you about testifying or not testifying?
>
> Mr. Nicks: I'm going to take the stand in this matter.

The government relies on this passage to characterize Nicks as a wily and resourceful lay litigator. The effort is entirely unpersuasive. Nicks decided to testify against his attorney's advice, a circumstance sufficient in itself to call his judgment into question. More importantly, Nicks' answer to the trial judge is bizarre. "At least I would be able to speak what is on my mind," Nicks said to the judge, "and then they can take me off to the County. That's what's going to happen." This is not a reasoned analysis of whether Nicks' interests would best be served by taking the stand in his own defense.

In short, to the extent that Nicks' mental state must be factored into the equation, a sound reason emerges for his failure to petition at an earlier time for *coram nobis* relief. At no time revealed by the post-sentencing record was Nicks in a condition to evaluate the need for and prospects of *coram nobis* relief, or to instruct his attorneys in that regard. To hold otherwise would be to condemn an incompetent inmate for his failure to initiate litigation on the issue of his own competence.

### III

■ I must also consider whether, as urged by the government, Nicks' petition should be dismissed as untimely because various court-appointed attorneys did not request such relief at an earlier time.

There is no substance to that suggestion. Concannon closed his file after Judge Knapp sentenced Nicks. He did not reopen it until 1989, in the context of the *coram nobis* petition. Concannon's inactivity during the interim is not relevant. Counsel appointed in New Jersey focused on the defense of that State's charges against Nicks. The potential adverse effects of Nicks' 1974 conviction in this Court were not so apparent in the context of the New Jersey cases as to require those attorneys to commence a separate proceeding in the Southern District of New York attacking that conviction. As for Alabama trial counsel defending Nicks against the 1983 capital charge, present counsel say without contradiction that those attorneys received from the State a flat fee of $1,000 for their services and $500 for expenses. It is not surprising that they did not retain New York counsel to commence a *coram nobis* proceeding. Alabama appellate counsel filed direct appeals and petitions for post-conviction relief in Alabama before attacking the 1974 conviction in this Court. They cannot be criticized for the resulting passage of time. Counsel first exhausted available state remedies. In *habeas corpus* cases, 28 U.S.C. § 2254(b) requires exhaustion of state court remedies unless state corrective process is unavailable or ineffective. In *coram nobis* practice there is authority for the proposition that the writ cannot be used "to set aside a judgment rendered by another court." *Lowery v. McCaughtry,* 954 F.2d 422, 423 (7th Cir.1992), *cert. den.,* — U.S. ——, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992). Alabama cases hold that once an objection is made to an

allegedly invalid prior conviction, the proper forum in which to challenge the conviction is the court that imposed it. *See Johnson v. State,* 541 So.2d 1112, 1115 (Ala.Cr.App. 1989); *Jones v. State,* 431 So.2d 1367, 1372 (Ala.Cr.App.1983). These holdings are consistent with the general rule. The government seeks to avoid their effect by observing that *Johnson* and *Jones* involved prior Alabama convictions in different state circuit courts; it says that no reported Alabama case holds that a capital defendant cannot challenge in Alabama the constitutionality of a prior conviction in an out-of-state court. That absence of authority is not surprising; the proposition would seem to follow *a fortiori.* More to the point is the government's inability to cite any case holding that the Alabama courts would undertake to litigate the constitutionality of a conviction in an out-of-state federal court.

Even if Nicks had not pursued available Alabama remedies to challenge the constitutionality of the 1974 conviction, there is authority in this Court for the proposition that a "quasi-estoppel doctrine" arising out of state proceedings is not applicable to bar a writ of error *coram nobis* challenging a federal conviction for constitutional infirmity. See *Haywood v. United States,* 127 F.Supp. 485, 487 (S.D.N.Y.1954) (Weinfeld, J.).

In short, no acts or omissions of Nicks' state-appointed counsel militate against the timeliness of the present petition.

### IV

■ The Supreme Court in *Morgan* did not specify what sort of "sound reasons" would justify a delay in seeking *coram nobis* relief. Nor did the Second Circuit in *Nicks,* except to say that "[t]he fact that he may have had no reason to challenge the New York conviction until after the sentence was imposed in Alabama is not, standing alone, a sound reason." 955 F.2d at 167 (citing *Maghe v. United States,* 710 F.2d 503, 503–04 (9th Cir.), *cert. denied,* 463 U.S. 1212, 103 S.Ct. 3549, 77 L.Ed.2d 1396 (1983)). In *Maghe* the petitioner received an undesirable discharge from the Army in 1956 as the result of a criminal conviction that year. In 1981 he requested the Army to upgrade his

discharge. The Army refused. Maghe then sought to attack the 1956 conviction by writ of error *coram nobis.* The Ninth Circuit held that Maghe had failed to allege "sound reasons" for waiting 25 years "before seeking to upgrade a discharge that he allegedly knew should be upgraded." 710 F.2d at 504. With due respect, I have some difficulty applying the facts and rationale of *Maghe* to support the proposition for which the Second Circuit cited it in the case at bar. But that is neither here nor there. While giving full effect to the Court of Appeals' direction, I nevertheless conclude that Nicks' mental condition while incarcerated, the limitations under which his trial counsel labored, and the proper procedural path trod by his appellate counsel combine to establish sound reasons why Nicks did not apply earlier to this Court for *coram nobis* relief.

### V

■ Accordingly this Court must determine whether a competency hearing was constitutionally required at the time of Nicks' plea and sentencing in this Court in 1974–75. The Second Circuit held in *Nicks* that "only that evidence [relating to Nicks' incompetency] of which the trial court had knowledge at the time of petitioner's plea and sentencing may properly be considered." 955 F.2d at 168. An evidentiary hearing is required because Judge Knapp's and Concannon's accounts appear to differ on a central point. Concannon said during the *coram nobis* hearing that his doubts as to Nicks' competency, expressed to support the petition, had also "been disclosed to Judge Knapp off the record in 1974–1975." A magistrate to whom Judge Knapp referred the petition expressed the belief that Judge Knapp had "in late 1974 and early 1975 substantially all of the facts upon which petitioner bases his present claim." Judge Knapp disclaims that prior knowledge. *Id.* at 165–66. I do not regard myself as bound by the magistrate's views, and will consider the matter *de novo.*

A separate order scheduling the hearing will enter.