**Harry NICKS, Petitioner,**

v.

**UNITED STATES of America,
Respondent.**

**No. 89 Civ. 5155 (WK).**

United States District Court,
S.D. New York.

March 28, 1990.

Amendment to Directions to Magistrate,
May 24, 1990.

Memorandum Granting Writ Feb. 4, 1991.

John T. Montgomery, Geoffrey R. Bok, Ropes & Gray, Boston, Mass., Laurence T. Sorkin, Cahill, Gordon & Reindel, New York City, for petitioner.

Richard E. Signorelli, Asst. U.S. Atty., S.D.N.Y., New York City, for respondent.

## MEMORANDUM & ORDER

WHITMAN KNAPP, District Judge.

In his petition for a writ of error *coram nobis,* petitioner Harry Nicks seeks to vacate a 1974 conviction on the ground that the lack of a competency hearing at the time of plea and/or sentence rendered void the plea upon which the conviction was based. For reasons that follow, the writ will be granted in twenty days unless the government requests a hearing before that time.

## BACKGROUND

On June 7, 1974, petitioner Harry Nicks was charged in a two-count indictment with the armed robbery of the Franklin National Bank in New York City. He faced sentences of up to twenty years' imprisonment on Count One (18 U.S.C. § 2113(a), bank robbery) and twenty-five years on Count Two (18 U.S.C. § 2113(d), assault with a dangerous weapon during the robbery). On June 17, he pleaded guilty to Count Two ("the 1974 conviction"), and, on January 16, 1975, was sentenced under the Youth Corrections Act to an eight-year indeterminate sentence. At both proceedings he was represented by Thomas J. Concannon, Esq., who at the time was an associate attorney on the regular staff of the Legal Aid Society.

It would appear that the most significant consequence of the conviction occurred four years after petitioner's release from federal custody when, on August 2, 1984, he was sentenced to death by the Jefferson County Circuit Court of Alabama after a jury had found him guilty in the first degree of an unrelated murder. In deciding to impose the death penalty, the Alabama trial judge, pursuant to state statute, considered two aggravating circumstances, one of which was the 1974 conviction.

## FACTS

On July 27, 1989, petitioner filed his petition for a writ of error *coram nobis* pursuant to 28 U.S.C. § 1651, seeking relief from the 1974 conviction on the ground that "the Court improperly accepted his guilty plea—without conducting a competency hearing—despite clear evidence before the Court that he was not competent." Petition, p. 1.

In support of his contention that there had been "clear evidence" of incompetency, petitioner initially relied on the transcript of the plea; three evaluations of petitioner's mental health, which were prepared after the plea and were made available to me before the sentencing; and the transcript of the sentencing. The record was later supplemented with an affidavit by Concannon, in which he described his thought processes during the course of his representation of petitioner; and Concannon's testimony before me at a hearing on the petition in which he explained in greater detail the bases for his thoughts and actions.

### (1) *The Plea.*

The petition focuses on two aspects of the plea proceeding. First, it notes that I twice commented that petitioner's version of the crime to which he was pleading did not "make sense." Petition, Appendix A–3, at p. 6. Although petitioner was pleading guilty to endangering the life of another during the course of a bank robbery, he contended that his gun was not loaded at the time he pointed it at the bank teller, and that he did not load it until he was "coming on the outside of the bank, leaving." *Id.* After a discussion with Concannon, petitioner retracted this contention, and indicated that he had, in fact, entered the bank with the gun loaded. *Id.* at 7.

Second, the petition refers to the following exchange:

THE COURT: Are you prefectly [sic] satisfied that he understands what he is doing?

MR. CONCANNON: Yes, your Honor.

THE COURT: He is not under any mental condition, it doesn't seem to me.

THE WITNESS: No.

MR. CONCANNON: I have discussed it with him three or four hours. He seems to understand very well what he is doing.

MR. SCHATTEN [Asst. U.S. Atty.]: Your Honor, could we find out if he takes narcotic drugs?

Q When is the last time you stopped taking any narcotic drugs?

A Never.

Q It was just medicine?

A Medication.

Q When was the last time you took any medication?

A Last week.

Q What kind of medication was that?

A Small pills.

MR. CONCANNON: He doesn't know what the drug was.

Q You haven't taken any of that for the last couple of days?

A No.

Q You haven't taken any narcotics at all?

A No.

THE COURT: Anything else?

MR. SCHATTEN: No, your Honor.

Q Do you want the indictment read to you or have him read it?

MR. CONCANNON: I have been over it with him. I don't see any reason for rereading it.

*Id.* at 11–12.

(2) *The mental health examinations.*

Following his plea, petitioner was examined by two psychiatrists and a psychologist, each of whom issued a report that was presented to me prior to the day of sentencing.

The first such examination was obtained by Concannon, who, in his affidavit requesting funds therefor, stated that he believed his client's "condition indicates that he may be suffering from a mental disorder" and that petitioner's probation officer had recommended that a psychiatric interview be conducted. Petition, Appendix D. This examination was performed by Norman Weiss, M.D., Diplomate, American Board of Psychiatry and Neurology, whose observations and conclusions included the following:

When I questioned him about the charges against him he appeared to be clear. I asked him why he pled guilty. His answer to this question was also rambling. He stressed the fact that he would have to spend time in jail either way and, therefore, wanted to get it over with so that he could get out of jail and return to his family. At this point he became blustery indicating that he would take anything that was given to him. The possibility of a very long jail sentence was not, I feel, fully appreciated by him. When speaking of ten or twenty five years in prison his answer had to do with serving his time and returning to his family, as if the years in prison would change nothing. At another point, he said that he pled guilty, "because I didn't want to be in a dirty place." By this, he was referring to prison. He said that he was afraid to eat the food because of "germs." He went on to say that he did not like to eat in public places outside of the South. His hope then, was that the sooner he spent his time, the sooner he would be able to get away from the "dirt." This example of irrational thinking which has no cultural basis, strongly suggests delusional thinking.

Diagnostically I consider him as mentally retarded and probably borderline psychotic based on the poorly organized thought processes and delusional, primitive thinking described above.

Since his decision about his plea was based in part on disordered thinking, interfering with proper judgement, I question his competency. I[n] addition, his mental retardation compromises his judgment.

Petition, Appendix A–1 at pp. 1–2.

The two other mental health evaluations emanated from the Federal Correctional In-

stitution in Milan, Michigan where the U.S. Board of Parole conducted a Classification Study of petitioner to better inform its sentencing recommendation. Reports were submitted by Peter Davol, M.D., staff psychiatrist, and Thomas S. Rosenbaum, Ph.D., Coordinator, Mental Health Programs.

In pertinent part, Dr. Davol's report notes:

> [Shortly after his arrival, petitioner] exibited [sic] pressured speech, motor restlessness and loosened associations. He paced up and down the room, rambling on in an only sometimes coherent manner about wanting to get out of prison and asking that I call his mother to effect his release. He was willing to talk with me, but did not view himself as in need of psychiatric help.
>
> I recommended that he be allowed to call his mother that evening, and the following day he appeared calmer when seen in his cell and rational to the point of saying that he realized that his mother would not be able to get him out, but that it was good to talk to her. He was fully oriented and appeared to understand the reasons for his being at Milan and the nature of his study.
>
> ... Today he was restless and pressured as before, difficult to impossible to keep on any train of thought, and preoccupied with insisting that he was "a man". He either could not or would not discuss the offense, the trial or much about his past history. His manner was belligerent but he did not appear dangerous. There was no evidence of delusions or hallucinations. His affect was predominately angry. Insight and judgment appeared severly [sic] limited.
>
> In the absence of much past history, it is difficult to know how long this man has been as disturbed as he is now. From conversations with other staff here, I get the picture of a man who, when he doesn't feel threatened and where the conversation involves relatively conflict-free subjects, is reasonably alert and "together" ... He is clearly suffering from a major psychotic illness in the current stressful situation, but he is unwilling to seek out medical help for it.

Davol Psychiatric Eval. at Appendix A–2.

The psychological report of Dr. Rosenbaum observes that petitioner was "agitated," "quite disturbed," "overtly delusional," "potentially dangerous and a threat to society." Rosenbaum Psychol. Rep. at Appendix A–2. The report reflects a "diagnostic impression" of "schizophrenia, paranoid type (acute and severe)" and recommends immediate psychiatric treatment.

### (3) *The Sentencing.*

Although the transcript of the sentencing is annexed to the petition, the proceeding is not discussed therein. The transcript reflects my observation that the defendant appeared to understand the essentials of the charge against him, and Concannon's representations that petitioner had made it very clear that he did not want a competency hearing, and that he wished to be sentenced so he could begin serving his time. Appendix A–4, Sentencing Tr. at 2, 6. Concannon further stated that petitioner understood the significance of the sentencing, and had understood what was happening and what he was doing at the time he pleaded. *Id.* at 2–3.

### (4) *The Concannon Affidavit.*

Concannon's affidavit of November 17, 1989 indicates, however, that he had strong doubts as to petitioner's competence. Concannon Affid. at ¶ 8. Concannon reports that it was "almost impossible to communicate with [petitioner]," whose responses to explanations and inquiries were limited to short, angry outbursts and shakes of the head. *Id.* at ¶ 6. Petitioner had an "extreme, irrational fear of mental institutions" and stated that he would prefer a 25 year jail term to a one year commitment in a mental institution. *Id.*

Concannon's doubts were bolstered by conversations he had had with petitioner's probation officer, who thought the plea should be withdrawn and a determination of competency made, and with Dr. Weiss, who, as noted above, had conducted a psy-

chiatric examination of petitioner at Concannon's request. Dr. Weiss informed Concannon that although petitioner probably "understands the charges against him ... it is questionable whether he can cooperate with counsel." *Id.* at ¶ 7.

As the time for sentence approached, Concannon sought the advice of his superiors and, for reasons more fully explained at oral argument (discussed below), decided not to share his doubts with the court.

### (5) *The Concannon Testimony.*

Concannon's testimony at oral argument indicated that, at the time of plea and sentence, petitioner was well aware that he had committed a crime and that a plea would result in at least the term of imprisonment he received. Despite his awareness that this result might have been obviated by an incompetency hearing, petitioner violently opposed any suggestion that his competency be called into question because he preferred imprisonment to confinement in a mental institution.

Concannon elaborated on his strong doubts that the mental processes of reaching that decision were rational. His misgivings, although buttressed to some extent by the opinion of petitioner's probation officer and the various reports that were available, were principally predicated on his conversations with his client. Thus, for example, he testified:

> ... I would say to him, for example, "If we go through a competency hearing, it may be that you will be sent here, for an examination to a particular place" ... And he would respond, "I've got these bugs, I can't get these bugs off me." And it would take perhaps half an hour of discussions about bugs before we could get back to just trying to make choices.

Tr. at 24.

Concannon also addressed petitioner's ability to assist in his own defense:

[I]f I were to say to him, All right, Harry Nicks, we just can't go ahead like this. What the government is offering is ridiculous in terms of a plea, let's go to trial, and I'm going to go to the MCC and see you and we will begin to prepare our strategy for making this battle, he would have been of no help to me whatsoever if I tried to explain to him Fifth and Sixth Amendment rights, choices about whether or not he should testify....

He wanted the bugs off him, the dirt off him and to get on with this, and when he said "I want to get on with this and I want to be done with this," I believed him, and I believe he understood that much. If it got anymore complex than that, he would have been no help to me, and I would have had to seek—if we were going to go to trial, I think I would have had to alert the marshals to stay close to him. I would have expected to be assaulted myself throughout the course of the proceedings.

Tr. at 19, 21.

In addition, Concannon explained fully the reasons for his decision to withhold his misgivings from the court in accordance with his client's wishes.[1] First, he was satisfied that his client did not want his competency questioned. Second, in light of his client's dread of mental institutions, he was satisfied that as a practical matter his client would have benefited more from psychiatric care provided by the Bureau of Prisons than if he had prevailed at a competency hearing and had been sent to a mental institution. Tr. at 20–21. Concannon also was moved by his own reluctance to "play God" with his client by ignoring his wishes, being fully aware that so doing might ultimately result in saddling his client with a twenty-five-year sentence instead of the eight-year sentence he had every reason to expect. Tr. at 20, 24.

### DISCUSSION

▮ The right of a defendant to a competency hearing arises when the evidence

---

1. Although the propriety of Mr. Concannon's decision to conceal his misgivings from the court is not before me, I must say I can find no fault with it. Indeed, it would seem arguable that he was obligated to withhold his misgivings, principally grounded as they were on conversations he had with his client.

provides a reasonable ground for believing that he or she may be incompetent to stand trial. *See, e.g., Silverstein v. Henderson* (2d Cir.1983) 706 F.2d 361, 369. To the extent that it ensures a defendant's ability to defend himself or herself, the right is fundamental to our adversary justice system. *Cf. Drope v. Missouri* (1975) 420 U.S. 162, 171–72, 95 S.Ct. 896, 903–04, 43 L.Ed.2d 103. It is jealously guarded and virtually unwaiveable. Thus, for example, denial of the right may form the basis for the collateral attack of a conviction notwithstanding the defendant's failure in the trial court either to request a competency hearing or to object to the court's failure to order one *sua sponte*. *See id.* at 366–68; *Pate v. Robinson* (1966) 383 U.S. 375, 384, 86 S.Ct. 836, 841, 15 L.Ed.2d 815.

■ Bearing in mind these legal principles, I initially intended to deny the petition on its face for much the same reasons the government now urges.[2] After reviewing all the facts that came to my attention on or before the day on which sentence was imposed, I was not persuaded that a competency hearing should have been conducted, and I was particularly confident that Concannon—who in 1974 was known to me as a highly knowledgeable and competent defense attorney[3]—would have brought to my attention any possible defense available to his client.

Before I issued my decision, however, I learned of Concannon's intention to submit an affidavit in support of the petition. In that affidavit, Concannon depicts petitioner as a hostile and uncooperative client with an extreme fear of mental institutions; attests to his doubts in 1974 as to petitioner's competence; and explains his reasons for not sharing those doubts with the court. However, as I noted at oral argument, Concannon did not state in his affidavit that he believed his client was not competent to assist him either in plea negotiations, sen-

tencing, or at trial. I inferred that his failure to so state reflected an inability to do so.

Of course Concannon's above-quoted testimony at oral argument proved otherwise. Had Concannon made known to me his strong doubts and the facts from which those doubts arose, I certainly would have ordered a competency hearing. As his testimony now reveals, evidence existed which, had it been before me, would have raised serious doubts as to petitioner's competency. Although this case is unusual in that the evidence that entitled petitioner to a hearing was not before me at the time that right arose, I am not persuaded that this is a meaningful distinction where, as here, the evidence of incompetency was so compelling.

The fact that such evidence was deliberately withheld by defense counsel in an effort to best serve the interests and wishes of his client does not alter my conclusion that petitioner was entitled to a hearing. Although concealment of such evidence may raise the possibility of waiver in any other situation, the serious doubts of petitioner's competence raised by Concannon's testimony preclude a finding of waiver here. As the Supreme Court noted in *Pate v. Robinson* (1966) 383 U.S. 375, 384, 86 S.Ct. 836, 841, 15 L.Ed.2d 815, "it is contradictory to argue that defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial."

In light of the foregoing, I find that the lack of a competency hearing violated petitioner's right to a fair trial, and that the petitioner is entitled to relief from the conviction because a competency hearing at this late date would be a "wholly inadequate substitute for the 'concurrent hearing' into competency mandated by *Pate*." *See Silverstein v. Henderson* (2d Cir.1983) 706 F.2d 361, 369.

---

**2.** My initial thoughts are embodied in a draft memorandum I prepared before I had learned that petitioner's application would be supplemented with Mr. Concannon's affidavit. That memorandum was made available to counsel one week before oral argument. A copy is annexed hereto.

**3.** Mr. Concannon remained on the Legal Aid's Southern District staff until September 4, 1979. He was then placed in charge of the Society's operations in the Eastern District, where he still holds that position.

As I observed at the hearing, the government was surprised by my decision to take testimony and was prepared neither to cross-examine Concannon nor to offer any contrary testimony that may be available. Accordingly, this opinion will be deemed a proposed decision and will be held in abeyance for a period of twenty days to permit the government to advise me whether or not it intends to cross-examine Concannon or subpoena any other witnesses.[4]

## CONCLUSION

For the foregoing reasons, the writ will be granted in twenty days unless the government requests a hearing.

SO ORDERED.

## APPENDIX

DRAFT MEMORANDUM—*U.S. v. Nicks*
WHITMAN KNAPP, U.S.D.J.

I have carefully reviewed the petition for writ of error *coram nobis*, and concluded it cannot be granted.

I first observe that petitioner was at all times represented by Thomas Concannon, Esq. at that time as Associate Attorney on the regular staff of the Legal Aid Society. Mr. Concannon was then known to me as a highly knowledgeable and competent defense attorney on whom I could confidently rely to bring to my attention any possible defense available to his client. The record presented to me on this petition demonstrates the careful manner in which he conducted his representation of the petitioner.[1] Against that background I shall review all the facts that came to my attention on or before January 19, 1975, the day on which sentence was imposed.

The petitioner entered his plea of guilty on June 17, 1974. The thirteen page minutes of the hearing at which the plea was taken contain no suggestion that the petitioner did not fully understand what he was doing, and why. It is almost routine for a defendant who is entering a plea of guilty to do his best to avoid making statements that make him look bad. This accounts for petitioner's insistence that the shot which actually hit the guard was shot "in the air" (p. 4, L. 16; p. 6, Ll. 1–5), and for the rather absurd assertion that he did not load his gun until he was "coming on the outside of the bank, leaving" (P. 6, Ll. 14–15). As I routinely do in such situations, I told the defendant that his story didn't "make much sense", and that he'd "better go and talk it over with his lawyer". I must confess that when such situations arise, I sometimes have qualms that the ensuing "talk" may amount to no more than the lawyer's browbeating his client to make him produce a record which will let the lawyer conclude the case and go home. No such qualms would ever occur to me when Mr. Concannon was representing a defendant. With respect to the prosecutor's request that I "ask Petitioner if he take[s] narcotic drugs" (petition p. 7), the judges in this district routinely ask that question. When—as I did—a judge neglects to ask it, the prosecutor routinely requests him to do so.

The sentence was imposed on January 16, 1975. The petition annexes the twelve page sentencing minutes, but does not suggest that they contain any relevant material. I have examined the minutes and concur in petitioner's apparent view that they do indeed contain nothing helpful to his cause.

I now turn to the psychiatric and psychological reports which were before me at the time of sentence. The first is a psychiatric evaluation obtained by Mr. Concannon

4. If I am so advised, because of my own schedule constraints, I shall then appoint a magistrate to hear and report. The magistrate will hear and report on the question of whether or not, assuming that Mr. Concannon had decided to make an application before me for a hearing and had diligently marshalled all the evidence available to him, I would have granted the application. The magistrate, of course, will not review my legal conclusion—which can be reviewed by the Court of Appeals or on a motion to reargue—and will not consider any fact that arose after the sentencing.

1. Mr. Concannon remained on the Legal Aid's Southern District staff until September 4, 1979. He was then placed in charge of the Society's operations in the Eastern District, where he still holds that position.

from Norman Weiss, M.D., Diplomate, American Board of Psychiatry and Neurology. Dr. Weiss was not known to me, but I made the following assumptions on the basis of his having been retained by Mr. Concannon: (a) he was a person of integrity; (b) he was knowledgeable in the field of criminal forensic medicine and would have known that in order to help Mr. Concannon's client he would have had to come up with a position suggesting that it would have been appropriate to order a hearing to determine the client's ability to understand the proceedings leading up to his plea; and (c) he would do anything he conscientiously could to help the client of the lawyer that had retained him. With these assumptions in mind, nothing in Dr. Weiss's letter suggested to me that there was any basis for a hearing on petitioner's mental competence.

Secondly, there were two reports emanating from the Federal Correction Institution, Milan, Michigan: A psychiatric evaluation dated November 15, 1974 by Peter Davol, M.D., staff psychiatrist; and a psychological report dated November 27, by Thomas S. Rosenbaum, Ph.D., Coordinator, Mental Health Programs. These reports present a picture of a highly disturbed and angry individual, not an unusual profile for an armed robber. However, although both were prepared by apparently responsible prison officials who knew I would rely upon them in imposing sentence, neither suggested that a hearing to determine competence might be appropriate. Indeed Dr. Davol's report has a paragraph with quite contrary implications:

> I recommended that he be allowed to call his mother that evening, and the following day he appeared calmer when seen in his cell and rational to the point of saying that he realized that his mother would not be able to get him out, but that it was good to talk to her. He was fully oriented and appeared to understand the reasons for his being at Milan and the nature of his study.

In brief, neither of these reports suggested at the time—or suggests now—that a hearing was—or would have been—appropriate.

## AMENDMENT TO DIRECTIONS TO MAGISTRATE

Having reviewed the testimony taken before Magistrate Roberts on May 22, and having considered the Magistrate's comments at the end thereof, it appears that my directions to the Magistrate should be amended. Accordingly, the Magistrate is not to concern herself with what I "would have" done had certain facts been known to me, but to report her conclusions as to what relief—in light of the facts she now finds then to have existed—petitioner was entitled at the time of his plea and/or sentence under the doctrine enunciated in *Pate v. Robinson* (1966) 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 and *Silverstein v. Henderson* (2d Cir.1983) 706 F.2d 361. As indicated in my original decision, it is wholly immaterial whether or not I was—or should have been—aware of the circumstances giving rise to such entitlement.

SO ORDERED.

## MEMORANDUM GRANTING WRIT

Pursuant to my Memorandum and Order of April 17, 1990, as amended on May 24, Magistrate Judge Kathleen A. Roberts (hereinafter "Judge Roberts") has reported her finding that "following his plea and at the time of his sentence" petitioner Harry Nicks' "competency was sufficiently in doubt to require the court to hold a competency hearing." Having reviewed respondent's December 14 objection to that Report (to which was attached the exceedingly detailed and competent memorandum submitted to Judge Roberts), and made a *de novo* study of the testimony taken before her (with special attention to the examination and cross-examination of the witness Concannon), I accept and adopt as my own the quoted finding, and conclude that the petition must be granted.

As respondent's memorandum before Judge Roberts implicitly recognizes (See E. *Concannon's present recollection is unreliable*, pp. 43–47), the reliability of Concannon's testimony is vital to the decision of this case. Wisely, respondent in no way challenges Concannon's integrity or even suggests that any word of his testimony

represented anything but what he believed to be true at the time he was testifying. Respondent simply points to Concannon's obvious loyalty to and sympathy for his client, and suggests that the resulting undoubted bias has hopelessly skewed Concannon's recollection of the relevant events. Judge Roberts considered this contention, and rejected it. In footnote 17, on page 26 of her Report she observed: "I ... emphatically reject the government's suggestion that Concannon's recollection is faulty or that Concannon's testimony should be discounted on grounds of bias." I independently reach the same conclusion on the basis of: my own study of Concannon's testimony before Judge Roberts, my recollection and reading of his remarks and testimony at the February 9 hearing before me, and my knowledge of his character and personality acquired over the past many years.

However, one observation must be made. Concannon, in his testimony before Judge Roberts, emphatically asserted a recollection that back in 1975 he had fully advised me of the basis for his concern about his client's competence. As clearly indicated in my March 18, 1990 memorandum and my April 17 Order of Reference, my recollection as to the extent of his then disclosure is quite different. Judge Roberts has found his recollection to have been correct (See Report, p. 26). However, having read her Report and re-studied the testimony, my original recollection remains.[1]

If it made the slightest difference to a decision in this case which of our recollections in this regard is more accurate, I would undoubtedly recuse myself and cause the matter to be reassigned to a non-participating Judge. However, as I have repeatedly observed, what I knew or did not know is wholly irrelevant. The relevant question is: did the facts *as they existed* (regardless of who knew them or

who didn't) constitutionally require that petitioner be afforded a hearing before judgment was rendered against him. There can be no doubt as to the answer to that question: the basic facts as to petitioner's words and conduct, which Concannon so vividly remembers, mandated that such a hearing be held. The Writ must therefore be granted.

SO ORDERED.

---

1. Concannon's and my recollections are affected by opposing institutional biases. As a lawyer, he would obviously like to remember himself as completely candid with the court. As a Judge, I would—equally obviously—have a strong bias against remembering myself as knowingly committing constitutional error. At the same time, we were both under the constraint of trying to achieve what we then conceived to have been in petitioner's best interest. I suspect that if the Almighty were to provide us with a videotape of what we actually did and said sixteen years ago we would both be very surprised. Needless to say, I express no *judicial* view as to the correctness of Judge Roberts' finding in this regard.