Harry NICKS, Petitioner,

v.

**UNITED STATES of America, Respondent.**

No. 89 Civ. 5155 (CSH).

United States District Court, S.D. New York.

Jan. 17, 1995.

Mary Jo White, U.S. Atty., S.D.N.Y., New York City, for U.S. (Jeffrey B. Sklaroff, of counsel).

Ropes & Gray, Boston, MA (William L. Patton, Laurie R. Wallach, James S. De Graw, of counsel) and Cahill Gordon & Reindel, New York City (Laurence T. Sorkin, of counsel), for petitioner.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

This is a petition for a writ of error *coram nobis*. Petitioner Harry Nicks seeks to vacate his 1974 conviction and 1975 sentencing before Judge Whitman Knapp of this Court on a charge of armed bank robbery. Nicks claims that he was deprived of a constitutionally required competency hearing before sentencing. Judge Knapp granted relief. The Second Circuit reversed and remanded the case to a non-participating district judge for further proceedings.

The underlying facts are set forth in Judge Knapp's opinion granting the writ, 760 F.Supp. 293 (S.D.N.Y.1990); the Court of Appeals' opinion reversing and remanding the case, 955 F.2d 161 (2d Cir.1992); and this Court's opinion dealing with the first of the two questions posed on remand, 835 F.Supp. 151 (S.D.N.Y.1993). Familiarity with all these opinions is presumed. This opinion sets forth only those particular facts necessary to understand the remaining points at issue.

## I

On remand the Second Circuit identified two issues to be addressed: whether sound reasons existed to excuse Nicks' delay in seeking *coram nobis* relief; and, if the delay was excusable, whether a competency hearing was constitutionally required on the basis of the evidence actually before Judge Knapp at the time of the initial proceedings. This Court's opinion reported at 835 F.Supp. 151 resolved the first issue in Nicks' favor, and so I come to the second.

I must first consider what evidence of Nicks' mental state was actually before Judge Knapp at the time of Nicks' plea in

1975 and sentencing in 1976. There are two primary sources of pertinent evidence: what was written to Judge Knapp, and what was said to him.[1] What was written takes the form of psychiatric and psychological reports and evaluations. They form part of the record on this petition. What was said came from Nicks at the plea and sentencing hearings, and from Thomas J. Concannon, Nicks' court-appointed lawyer.

The statements in open court of Nicks and his counsel are preserved by the hearing transcripts. But there is an added dimension to the question of what was said to Judge Knapp. Concannon testified in 1990 at the hearings on the petition[2] that in off-the-record conferences prior to Nicks' sentencing in 1976, he disclosed to Judge Knapp certain of his misgivings concerning Nicks' competency. In his 1990 opinions addressing the petition, Judge Knapp said he had no recollection of such disclosures. I said in my prior opinion that a further evidentiary hearing on remand would be necessary "because Judge Knapp's and Concannon's accounts appear to differ on a central point." 835 F.Supp. at 156.[3] However, neither party wished to offer further proof on the point. They agreed that this Court should decide the issue after a *de novo* review of the existing record. On reflection, I agree that this is the sensible course. Recollections of 1975 and 1976 events will be no better today than they were in 1990.

The written record establishes the pertinent dates. Nicks offered a plea of guilty on June 17, 1974. During the allocution Concannon responded affirmatively to a question Judge Knapp was prompted to ask: "Are you perfectly satisfied that [Nicks] knows what he is doing?" However, on July 1, 1974, Concannon swore to an affidavit reciting his belief "that defendant's condition indi-

cates that he may be suffering from a mental disorder." That affidavit also recited that Robert Ohannessian, the Probation Officer assigned to Nicks' pre-sentence report, recommended a psychiatric interview of Nicks because he was unresponsive and uncooperative. Concannon asked for a psychiatric examination pursuant to 18 U.S.C. § 4244. The Court (Ward, J.) granted that order on July 2, 1974. Dr. Norman Weiss, the examining psychiatrist, submitted a report dated July 15, 1974, which Concannon forwarded to Judge Knapp on July 19.

Judge Knapp was scheduled to sentence Nicks on July 25, 1974. Instead, he committed Nicks for an additional 60–day study to the Federal Correctional Institution in Milan, Michigan. That order was made under former 18 U.S.C. § 5010(e), a part of the Federal Youth Correction Act, 18 U.S.C. § 5006 *et seq.*, since repealed. § 5010(e) authorized a pre-sentence committal of a defendant "for observation and study." At Milan Dr. Peter Davol, a psychiatrist, and Dr. Thomas Rosenbaum, a psychologist, examined Nicks and prepared written reports, as did Lenny Graves, a Youth Corrections Act case manager. These reports were included in a classification study presented to Judge Knapp on December 11, 1974.

Nicks was scheduled for sentencing on January 9, 1975. Following a discussion the content of which is in dispute, Judge Knapp adjourned the sentence for one week to January 16, 1976 and passed sentence on that date. Adopting the recommendation contained in the Milan classification study, Judge Knapp sentenced Nicks to an eight-year indeterminate sentence under § 5010(c) of the Youth Corrections Act.

## II

The differences of recollection between Concannon and Judge Knapp relate primari-

---

1. The government's briefs seek to make a point of Judge Knapp's observations of Nicks' demeanor. But those observations were limited to the plea and sentencing proceedings, and are less informative than impressions formed during a trial.

2. Judge Knapp conducted an evidentiary hearing on February 9, 1990. He then made an order of reference to Magistrate Judge Kathleen Roberts,

who conducted a further hearing on May 22, 1990.

3. The government characterizes this discrepancy as the "key fact in dispute ... upon which Nicks' petition turns." Main Brief at 1. That is something of an overstatement. Nicks argues that that even disregarding Concannon's alleged off-the-record disclosures, the available evidence required a competency hearing.

ly to what, if anything, Concannon said to the judge about Nicks' mental condition on two occasions: pre-hearing, off-the-record robing room conferences on January 9, 1975 and again on January 16. Concannon testified, in substance, that as the result of those discussions, he had conveyed to Judge Knapp prior to sentencing substantially all of the facts, concerns, observations, and impressions upon which Nicks bases his present claim of unconstitutional deprivation of a competency hearing. Judge Knapp, required to consider in 1990 Concannon's testimonial recollections of conversations occurring in 1975, says that he does not remember Concannon expressing these concerns.

In a characteristically wise and self-effacing reflection on the vagaries of human memory, Judge Knapp wrote at 760 F.Supp. at 301 n. 1:

> Concannon's and my recollections are affected by opposing institutional biases. As a lawyer, he would obviously like to remember himself as completely candid with the court. As a Judge, I would—equally obviously—have a strong bias against remembering myself as knowingly committing constitutional error. At the same time, we were both under the constraint of trying to achieve what we then conceived to have been in petitioner's best interest. I suspect that if the Almighty were to provide us with a videotape of what we actually did and said sixteen years ago we would both be very surprised.

The Almighty has not favored this Court with a videotape. Accordingly the task borne by this imperfect judicial instrument is to consider all the evidence and decide what I think probably happened. I can do no more, but for present purposes it must suffice.

### III

I begin with the observation that while (not surprisingly) Judge Knapp made no personal notes of the events of January 9 and 16, 1975, Concannon (again not surprisingly)

kept a contemporaneous file and log. That document is of considerable assistance.

First, it sheds light on what occurred during the off-the-record discussion with Judge Knapp on January 9, 1975. It was apparently Judge Knapp's practice to hold robing room discussions with counsel before the formal sentencing proceeding. At least he did so in this case. The government has never denied that the January 9 discussion took place, although it does not mention it in its briefs on remand or in the statement of facts in its appellate brief, which I was asked to read.

Concannon's case file contains the following handwritten notation for January 9, 1975: "Request plea withdrawal, adj. for 1 wk. to work out best plan with Ohannessian." A.425.[4]

At the May 22, 1990 hearing before Magistrate Judge Roberts, on direct examination by counsel for Nicks, Concannon referred to that entry and then described the January 9, 1975 discussion with Judge Knapp:

Q. Your file shows that a hearing was held on January 9, 1975. Do you see that entry?

A. Yes.

Q. Next to that entry, page 2 of Exhibit 1, it states: "Request plea withdrawal." Do you see that?

A. Yes.

Q. Do you know what that particular entry signifies with respect to what occurred before Judge Knapp on January 9?

A. Yes. I am sure that we had a meeting, again in the robing room, and we discussed the various reports and the options, and I believe that I at the time didn't think that I had any choice but to move to have the plea withdrawn. I think that Judge Knapp suggested that I try to work out something with O'Hannessian [sic], something coherent to present to Judge Knapp as a suggestion how to proceed.

---

4. Page references are to the Joint Appendix on the appeal to the Second Circuit, made a part of the record on this petition by stipulation.

Q. Do you know if Mr. Nicks was present on the 9th before Judge Knapp?

A. Yes. What happened was, he would be brought to the courtroom and sit there with marshals. He wouldn't have come back into the robing room where we were discussing these personal things about him.

Q. So your memory is that that there would have been a discussion with Judge Knapp in the presence of Assistant U.S. Attorney, prior to a session in open court?

A. Yes.

Q. And at that time you advised Judge Knapp that you didn't feel you had any choice but to withdraw the plea?

A. I believe that is right.

Q. Do you recall anything about what happened in open court after that meeting with Judge Knapp and the prosecutor?

A. I am sure I talked to Bob O'Hannessian, and then on the following day—is that too far?

Q. I am asking if you recall what happened at that hearing on the 9th in open court, in the presence of Mr. Nicks?

A. I don't.

A. 313–315.

Judge Roberts followed up on that subject:

THE MAGISTRATE: Excuse me. Before you get to that point, would you explain in a little bit more detail exactly what it was that you told Judge Knapp during these meetings in the robing room about your concerns or your ambivalence.

THE WITNESS: Yes, your Honor.

THE MAGISTRATE: Just to be specific, for example, as I understand it, there was a meeting in the robing room on January 9. This is the meeting that followed, apparently, the proceedings in open court that Judge Knapp referred to on the 16th.

THE WITNESS: Yes.

THE MAGISTRATE: And this was the meeting at which you said that Judge Knapp encouraged you to try to work with Mr. O'Hannessian and figure out what to do, etc.

THE WITNESS: Yes.

THE MAGISTRATE: Can you tell me as specifically as possible what it was that you told Judge Knapp about your relationship with the defendant or your concerns?

THE WITNESS: Yes. By that date I had expressed my concerns about his competence and that way he responded to me on many occasions to Judge Knapp, but specifically that day, in discussing the possibility of withdrawing the plea and Harry Nicks' objections to it—I am sure I alerted him to the fact that Harry Nicks didn't want his plea withdrawn.

In addition, I explained to him how difficult my position was. I couldn't just be an advocate and in some sense I was sort of going beyond the role of an advocate and having to make some judgments for this guy, and if he was competent to decide that he should go ahead, then he could make the decisions, and if he was not, as some of these reports suggested, then I might not have any choice but to move to withdraw the plea, notwithstanding his wishes.

THE MAGISTRATE: Thank you. But you had told Judge Knapp at this point, either on the 9th or in prior discussions, about the specific difficulty that you had communicating with Mr. Nicks and the fact that he couldn't really provide you with a, for example, coherent sequence of events or respond coherently to questions of anything other than an extremely literal nature?

THE WITNESS: Yes, I am sure I did. I am quite certain that there was really nothing about Harry Nicks that I was unwilling to tell Judge Knapp at the time in the robing room.

THE MAGISTRATE: So as I understand it, you basically shared with him all of the doubts and concerns and confusions, etc., that you were feeling at the time.

THE WITNESS: Yes, indeed.

A. 318–320.

Nicks' sentence was adjourned for one week, from January 9 to January 16. Con-

cannon's file contains this entry for January 16: "Off record sentence discussion with Judge Knapp and AUSA Fortuin; [defendant] not brought over; return at 2 p.m." Counsel for Nicks, resuming his direct examination, asked Concannon about that entry:

Q. Mr. Concannon, let me direct your attention back to your case notes, and specifically page 2 of Exhibit 1. There are two entries for January 16, 1975, the first of which contains the entry "Off record sentence discussion with Judge Knapp and AUSA Fortuin."

You just responded to some questions by the magistrate with respect to discussions that you had with Judge Knapp in the robing room. Do you know whether those discussions that you just referred to occurred specifically on January 9th or might they have occurred on the 16th as well?

A. I am almost certain both days. I am positive on both days.

Q. Beyond a discussion of your thoughts about Mr. Nicks' competence, do you know anything else that occurred at the off-record discussion with Judge Knapp on the morning of January 16th?

A. My notice indicates that he was not brought over from the—I guess MCC didn't exist at the time, so it wouldn't have been easy—I am sure it happened in the morning and they had to arrange to get him over from the Federal House of detention at West Street in the afternoon.

I believe that Judge Knapp told me what he planned to do. He is always pretty open about everything, and I am pretty sure that he told me what he was thinking of how he expected to proceed, based upon what he learned from me and O'Hannessian, and his own observations.

A. 320–321.

When Nicks appeared before Judge Knapp on January 16, 1975, the judge sentenced him to the eight-year indeterminate sentence under the Youth Corrections Act.

I accept Concannon's testimony and find that, during the January 9 and 16 robing room conferences, he brought Judge Knapp up to date concerning "all the doubts and concerns" Concannon entertained at that time about Nicks' mental competence. That testimony is corroborated by Concannon's contemporaneous notes. It is also inherently plausible.

The January 9 entry recites that Concannon requested a plea withdrawal and that the sentence was adjourned for one week in order to "work out the best plan" for Nicks with Probation Officer Ohannessian, whose prior concern about Nicks' mental state has been noted. The record suggests no reason for Concannon's request for a plea withdrawal and adjournment of sentence other than his concern about Nicks' competence. Judge Knapp granted the adjournment. It is logical to infer that Concannon communicated his concerns to Judge Knapp before Judge Knapp adjourned the sentence. It is also logical to infer that the direction to Concannon to get together with Ohannessian to work out a plan for Nicks came from Judge Knapp.[5]

Concannon's entry for January 16 refers to an "off record sentence discussion with Judge Knapp and AUSA Fortuin." It is equally logical to infer that at this conference, Court and counsel continued discussing the concerns which resulted in the January 9 adjournment. Judge Knapp then imposed the most lenient sentence available to him in the circumstances.

Concannon's account is entirely plausible. His January 9 request to withdraw Nicks' plea is the logical culmination of his mounting concern. Judge Knapp's willingness to allow a troubled attorney to vent that concern is typical of that good and compassionate trial judge. In those pre-guideline days of Part I criminal assignments, counsel representing defendants who came before Judge Knapp considered their clients fortunate.

---

5. Concannon so testified, at A. 330:
 THE MAGISTRATE: You said that on the 9th Judge Knapp said something to you of the fact,

get together with the probation officer, figure out something appropriate for Mr. Nicks.
THE WITNESS: Yes.

Concannon, recalling that past, testified to Judge Roberts: "But Judge Knapp was a great man, great judge, and there were two judges at this time that you would press really hard to have your cases resolved before, and one of them was Judge Knapp." A. 285. That reputation is consistent with Judge Knapp's participation in the sort of discussions Concannon describes, and imbues Concannon's account with an added measure of credibility.

The government relies on Judge Knapp's recollection that Concannon did not say to him what Concannon says he said. The judge also reasons that "[h]ad Concannon made known to me his strong doubts and the facts from which those doubts arose, I certainly would have ordered a competency hearing." 760 F.Supp. at 298. But Judge Knapp was careful not to brand Magistrate Judge Roberts' contrary finding as erroneous. Following his graceful reflections on human memory, quoted *supra*, Judge Knapp added: "Needless to say, I express no *judicial* view as to the correctness of Judge Roberts' finding in this regard." 760 F.Supp. at 301 n. 1 (emphasis in original).[6]

The government also relies on assurances concerning Nicks' competence that Concannon gave to Judge Knapp on the record at various stages in the proceedings. That reliance is understandable, but Concannon's words must be considered in the totality of the circumstances.

Nicks pleaded guilty before Judge Knapp in Part I on June 17, 1974. After Nicks' allocution, Judge Knapp asked Concannon: "Are you perfectly satisfied that he understands what he is doing?" Concannon answered: "Yes, your Honor." A. 19.

That response by counsel is of no probative value in determining the need for a competency hearing prior to sentencing. Concan-

non had met Nicks only 10 days earlier. Nicks' guilt on the charge of armed bank robbery was uncontrovertibly demonstrated by the physical evidence. In their relatively brief acquaintance, Nicks had not yet given Concannon cause for his subsequent concerns. In addition, Concannon was anxious to achieve a plea before Judge Knapp as Part I judge under the old assignment system. Concannon testified: "[B]y having Harry Nicks plead guilty on that day, Judge Knapp would have been the judge on the case for all purposes, and I considered that to be a great advantage and wanted to lock that in." A. 285. Of course, Concannon's desire to "lock in" Judge Knapp would not excuse a deliberate failure to disclose to the judge bases for doubting Nicks' competence to plead. But it would explain Concannon's moving quickly to offer a plea on Nicks' behalf, with a consequently diminished time period in which to get to know his client better.

Concannon got to know Nicks better during the period between plea and sentence, scheduled for July 25, 1974. So did Ohannessian, the probation officer. As noted, they both were so alarmed that Concannon asked the Court for a psychiatric examination of Nicks (performed by Dr. Weiss), and persuaded Judge Knapp to commit Nicks for further evaluation prior to sentence.

In these circumstances, Concannon's declaration at the June 17 plea does not bear significantly upon the present issue.

Concannon's remarks at the January 16, 1975 sentencing stand upon a different footing because by that time, Dr. Weiss's psychiatric evaluation had been supplemented by the psychiatric evaluation of Dr. Davol and the psychological report of Dr. Rosenbaum following Nicks' evaluation at Milan. Concannon had also conducted further meetings

---

**6.** The finding in question appears at page 26 of Judge Roberts' November 27, 1990 report to Judge Knapp, A. 519, where she wrote: "Based upon the testimony at the May 22 hearing before me, and the contemporaneous documentary evidence, it is now essentially indisputable that, contrary to Your Honor's initial impression, the court had before it all of the facts upon which petitioner bases his present claim." (footnotes omitted)

I have considered the evidence *de novo*. I quote Judge Roberts' finding only to place Judge Knapp's disclaimer in context.

I reject Nicks' present contention that the form of the government's objections to Judge Roberts' report, addressed to Judge Knapp, precludes it from contesting the issue in this *de novo* proceeding following the remand.

with Nicks. As we have seen, Concannon was so worried about Nicks' mental state that on January 9 he asked Judge Knapp for leave to withdraw Nicks' plea, and at the conclusion of that robing room conference agreed to a one-week adjournment of sentence so that he and Ohannessian could consider Nicks' options further. In those circumstances, it is at first blush somewhat startling to read this exchange during the sentencing on January 16:

THE COURT: Are you satisfied in your own mind, Mr. Concannon, that Mr. Nicks understands the significance of what he is asking to be done?

MR. CONCANNON: Yes, I do. I am satisfied, your Honor.

In addition, your Honor, I still believe at the time of the inquiry of the plea that Mr. Nicks knew what he was doing, he understood what was happening.

A. 50–51.

What Nicks "was asking to be done," as explicated by Concannon in his remarks to Judge Knapp just before this quoted exchange, was to avoid any further hearing on his mental condition, be sentenced, and start serving his time. A. 50.

Concannon's affirmations of Nicks' competence must be viewed in the context surrounding them. Those concerned with Nicks' welfare—Concannon, his Legal Aid superiors, and probation officer Ohannessian—were in a difficult situation. Nicks' options were limited. Probation was out of the question. The charge to which he pleaded carried a potential sentence of 25 years. A finding of incompetency would result in an indefinite period of detention coupled with the possibility of trial on the charge before a judge other than Judge Knapp. Nicks was resisting further mental studies and had shown himself to be uncooperative in the prior evaluations. The Milan report recommended an eight-year indeterminate sentence under the Youth Corrections Act, applicable to Nicks at his then existing age but not for much longer. The conceptual principle of the Youth Corrections Act—whether or not it was successfully implemented in practice—was that confinement under its terms offered better prospects for treatment and rehabilitation to youthful offenders. Nicks' attorneys had reason to believe that Judge Knapp would accept the Milan recommendation; and that sentence was clearly the best alternative available to Nicks.

During the week between January 9 and January 16 Concannon discussed all these factors with his superiors. They concluded that nothing should be done to prejudice the desired outcome. It is hard to quarrel with that conclusion. In that particular context, Concannon affirmed Nicks' understanding to Judge Knapp. I do not think his declaration is determinative of the issue before me.

Of course, that issue does not turn upon whether or not Concannon should have said something different to Judge Knapp at the January 16 sentencing hearing. I must determine what information Judge Knapp had received from any source prior to sentencing Nicks on January 16; and Concannon's words on that date must be factored into the equation. But those words would have a far greater significance if they had not been preceded by the January 9 robing room conference, at which, as I have found, Concannon made known to Judge Knapp the substance of his concerns about Nicks' mental condition.

V

That factual finding leads inevitably to the conclusion that the Constitution entitled Nicks to a competency hearing before he was sentenced. That constitutional entitlement is not abrogated by Nicks' preference that no hearing be held or Concannon's decision not to ask for one.

 The rule in the Second Circuit is that a competency hearing "must be held when there is reasonable ground for a district court to conclude that the defendant may not be competent to stand trial." *Nicks v. United States*, 955 F.2d 161, 168 (2d Cir. 1992). There exists "an affirmative obligation on the part of the trial court to order a competency hearing when warranted by the evidence." *Id.* It matters not that defendant's counsel, for whatever reason, does not request a hearing. "[W]here the evidence raised a sufficient doubt as to a defen-

dant's competence to stand trial, the failure of the trial court to conduct a competency hearing *sua sponte* violates due process." *Nicks* at 168 (citing *Pate v. Robinson*, 383 U.S. 375, 385, 86 S.Ct. 836, 842, 15 L.Ed.2d 815 (1966)). The obligation to conduct a competency hearing exists, even if in the particular circumstances of the case a finding of incompetency may operate to defendant's detriment rather than to his benefit. *Brown v. Warden*, 682 F.2d 348, 352–53 (2d Cir.), *cert. denied*, 459 U.S. 991, 103 S.Ct. 349, 74 L.Ed.2d 388 (1982). Evidence suggesting the possibility of incompetence may come from a variety of sources. *See Drope v. Missouri*, 420 U.S. 162, 180, 95 S.Ct. 896, 908, 43 L.Ed.2d 103 (1975). The trial court must hold a competency hearing if the combined effect of those sources is to raise "a flurry of warning flags" about defendant's mental state. *Saddler v. United States*, 531 F.2d 83, 87 (2d Cir.1976).

Concannon's primary concern arose from his difficulty in achieving sustained and meaningful communication with Nicks. In an affidavit he submitted in support of the instant petition, Concannon referred to probation officer Ohannessian's problem in that regard, and went on to say: "In addition, I found it almost impossible to communicate with Mr. Nicks, and almost all of his responses to my explanations and inquiries were limited to short angry outbursts or shakes of the head." A. 194. That inability to communicate prompted Concannon to ask for a psychiatric evaluation in an affidavit dated July 1, 1974 (A. 24). Concannon testified about the basis for that affidavit before Judge Roberts:

> Q. Would it be possible for you as you sit here today to tell us what percentage of the time that you spent with Mr. Nicks between the 7th and the time you filed the affidavit on July 1, he was coherent and lucid, and in what portion he was more out of control?
>
> A. Certainly less than 50 percent, significantly less than half the time was he—would I trust an answer that he would give me, trust it in the sense that it would either be—it was articulated in a way that I believed it came from an appropriate

place in memory and made sense and that he heard my question, that sort of thing—significantly less.

A. 297. I have found that Concannon related the substance of those concerns to Judge Knapp prior to sentencing.

Difficulty in communicating is significant because a defendant is not competent to stand trial or enter a plea unless he has " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as a factual understanding of the proceedings against him.' " *Godinez v. Moran*, —— U.S. ——, ——, 113 S.Ct. 2680, 2685, 125 L.Ed.2d 321 (1993) (quoting *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam)).

The medical evidence available to the Court at the time of sentencing makes it easy enough to understand why Concannon and Ohannessian had trouble communicating with Nicks.

Dr. Weiss examined Nicks on July 12, 1974. His written report to Concannon dated July 15, 1974 (A. 26–27) refers to Concannon's expressed concern about Nicks' "withdrawn behavior as well as possible delusional thinking." Dr. Weiss reported that Nicks spoke of his wishes for the future "in a rambling way that was difficult to follow." Perhaps more significantly, when Dr. Weiss asked Nicks why he pled guilty, "[h]is answer to this question was also rambling." Other declarations by Nicks "strongly suggests delusional thinking." Dr. Weiss concluded his report:

> Diagnostically I consider him as mentally retarded and probably borderline psychotic based on the poorly organized thought processes and delusional, primitive thinking described above.
>
> Since his decision about his plea was based in part on disordered thinking, interfering with proper judgment, I question his competency. I [sic] addition, his mental retardation compromises his judgment.

As noted, Nicks was then transferred to the Milan facility for a sentencing study. I would take a different view of this case if the psychiatric and psychological evaluations of

Nicks at Milan, made over a longer period of time, alleviated the concerns expressed by Dr. Weiss. On the contrary: they add to them.

Dr. Davol, the staff psychiatrist, issued a report dated November 15, 1974. A. 43. Dr. Davol saw Nicks on four occasions. The first occurred "shortly after [Nicks'] arrival, on an emergency basis, because of bizarre behavior." Nicks "exhibited pressured speech, motor restlessness and loosened associations." His speech consisted of "rambling on in an only sometimes coherent manner about wanting to get out of prison and asking that I call his mother to effect his release." Dr. Davol arranged for Nicks to telephone his mother, and saw Nicks in his cell the next day, at which time Nicks appeared "fully oriented and appeared to understand the reasons for his being at Milan and the nature of his study." However, when Dr. Davol saw Nicks again "a few days later," Nicks had retrogressed. Dr. Davol reported that "[t]oday he was restless and pressured as before, difficult to impossible to keep on any train of thought, and preoccupied with insisting that he was a 'man.'" Dr. Davol concluded that while "[i]n the absence of much past history, it is difficult to know how long this man has been as disturbed as he is now," Nicks "is clearly suffering from a major psychotic illness in the current stressful situation, but he is unwilling to seek out medical help for it."

Dr. Rosenbaum, a clinical psychologist and Coordinator of the Mental Health Programs at Milan, submitted a psychological report dated November 2, 1974. A. 42. Dr. Rosenbaum conducted his evaluation interview "in the hospital isolation area a week following threatening and abusive remarks" Nicks made to a staff member. Dr. Rosenbaum also relied upon observations of Nicks "in segregation and on the dormitory." Dr. Rosenbaum observed and reported "illogical vocalizations" on Nicks' part, including "a vague idea of a machine controlling his mind"; blaming his incarceration "on fate and a plot to put him away, with his wife as the instrumental 'devil' causing the plot to be effected"; and Nick's insistence that "he is 13,000 years old and is willing to suffer for his race and accept the fate which he has been informed is waiting for him, i.e., life in prison." Under the caption "Emotional Functioning," Dr. Rosenbaum gave a report which it is useful to quote in full:

Mr. Nicks is seen at this time as agitated and quite disturbed. He carries such an immense amount of anger that massive projection has been necessary to keep himself intact. The projection of this hostility is causing him to present himself in a threatening way to others. He is overtly delusional at this time and is quite convinced his delusions are accurate. He is not able to accept the blame for his actions, and both presents himself as the victim of a plot and the Muslim faith. All this, plus his incorporation of the penal system into this scheme, handily casts himself in a "Christ-like" position. He insists he is ready to take his end of the plot adding that no machine can have his mind. He denies hearing voices, but he insists messages come to him from outside himself. His words were mostly passive, but his affect and actions have been quite aggressive. This examiner sees this resident as potentially dangerous and a threat to society.

Dr. Rosenbaum's diagnostic impression" was: "Schizophrenia, paranoid type (acute and severe)." His recommendation was: "Immediate psychiatric treatment."

Lenny Graves, the Case Manager at Milan responsible for considering sentencing options, signed a "Staff Evaluation" (A. 44–45) of Nicks which reported that Nicks' "current delusional thinking and paranoid ideation apparently incapacitates [sic] him and inhibit him from profiting from training at this time." Expanding on that theme, Graves concluded his report with these words:

Institutional resources available for Nicks would include vocational training, on-the-job training, and intensive therapeutic intervention. However, before any of the aforementioned could be undertaken the subject's current psychological status would mandate that he be involved in long-term psychiatric treatment. Further, his present psychological instability would negate any community resources he may have potentially available to him.

Small wonder, then, that Concannon and Ohannessian encountered difficulties in engaging Nicks in rational discussions of his

circumstances. There is no evidence that Nicks improved between the completion of the Milan evaluation and the date of sentencing.

I am bound to say that the Weiss, Davol, Rosenbaum, and Graves reports, all of which were presented to Judge Knapp prior to sentencing, were in my judgment sufficient to raise a possibility of incompetence requiring a competency hearing under the authorities cited *supra*. I do not understand the Court of Appeals' decision remanding the case to preclude that conclusion on my part.

I am also acutely aware that Judge Knapp reached a different conclusion. Judge Knapp discounted the Davol and Rosenbaum reports because "neither suggested that a hearing to determine competence might be appropriate." 760 F.Supp. at 300. With the greatest respect, that observation misconstrues the purpose of the Milan evaluation, which was to make a sentencing recommendation for Nicks following a plea the Court had accepted, not to express an opinion on whether Nicks was competent to plead. The Milan facility conducted its sentencing study of Nicks pursuant to the Youth Corrections Act, 18 U.S.C. § 5010(e) (1970) (since repealed). In contrast to examinations under the competency statute, 18 U.S.C. § 4244, sentencing studies do not ordinarily relate their findings specifically to competence. *See United States v. Polisi*, 514 F.2d 977, 979–980 (2d Cir.1975) (comparing a competency examination with a sentencing study under then existing § 4208(b); sentencing studies are performed to "determine the rehabilitative treatment appropriate in light of the prisoner's general mental state," not to determine defendant's competence to participate in legal proceedings). In *Polisi* the

Second Circuit held that the psychiatric history and conclusions contained in a sentencing study required a competency hearing, even though the study did not (as Nicks' sentencing study did not) specifically address the question of competence.

Even if I am wrong in concluding that the documentary evidence available to Judge Knapp was sufficient to require a competency hearing, Concannon's concerns, which I have found he communicated to Judge Knapp, are clearly enough, when viewed together with all the other evidence.[7]

I conclude that the Constitution required a competency hearing before Harry Nicks was sentenced by this Court on January 16, 1975. Because no hearing was held, I grant Nicks' petition and vacate his conviction.

It is SO ORDERED.

**7.** The briefs for Nicks also rely on various of his statements during the plea and sentencing hearings, extensively quoted, which counsel characterize as non-responsive, bizarre, and indicative of incompetence. Neither proceeding went entirely smoothly. Quite often they do not. In the plea allocution context, for even highly intelligent and competent defendants, *"mea culpa"* can prove hard to say. I think the more compelling evidence of Nicks' possible incompetence is found in the medical evidence and the communication difficulties encountered by Concannon and Ohannessian.

I have also considered an opinion dated January 2, 1990, by Dr. Robert H. Berger, a psychiatrist, submitted by the government in opposition to the present petition. A. 204–212. Dr. Berger's "psychiatric-legal report," A. 204, concludes that there was no need in 1974 or 1975 to hold a hearing on Nicks' competence. I do not derive much assistance from Dr. Berger's report. To the extent it is "psychiatric", Dr. Berger never examined Nicks, and I derive more guidance from the contemporaneous reports of psychiatrists and psychologists who did. To the extent that Dr. Berger expresses a legal opinion, I flatter myself that I am at least as competent (so to speak) to apply Supreme Court and Second Circuit authority to the facts of the case.